965 P.2d 626 (1998)
92 Wash.App. 604
Tony J.M. APONTE, Respondent,
v.
STATE of Washington, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Appellant.
No. 39923-3-I.
Court of Appeals of Washington, Division 1.
August 31, 1998.
Publication Ordered October 13, 1998.
*627 Malcolm Ross, Asst. Atty. Gen., Seattle, for Appellant.
Bradley S. Keller, Karen V. Chiu, Byrnes & Keller, Seattle, for Respondent.
ELLINGTON, Judge.
The Department of Social and Health Services ("DSHS") revoked Tony Aponte's foster care license for refusing to undergo a sexual deviancy evaluation. DSHS also disqualified Mr. Aponte from employment at a licensed day care facility. On judicial review of its decision, DSHS withdrew the employment issue from consideration, and the King County Superior Court vacated that portion of the decision. In addition, the Superior Court reversed the revocation of Mr. Aponte's foster care license. DSHS appeals from this latter ruling.
We conclude that a sexual deviancy evaluation of Mr. Aponte was not "necessary" within the meaning of WAC 388-73-036(2)(k) and, therefore, his refusal to submit to such evaluation did not mandate revocation of his foster care license. We find, however, that DSHS had authority under the discretionary provisions of WAC Chapter 388-73 to revoke Mr. Aponte's foster care license on account of his refusal, and that DSHS did not act arbitrarily or capriciously in doing so. Although we reverse the Superior Court's ruling concerning the revocation of Mr. Aponte's foster care license, we affirm Mr. Aponte's award of attorneys' fees because he was required to seek judicial review of *628 DSHS's decision concerning his employment at a day care facility, he prevailed on that issue, and the attorneys' fees incurred with regard to that issue before DSHS withdrew it from consideration exceed the maximum allowable under the Equal Access to Justice Act.

Facts
In 1991, Tony Aponte became a teacher at the John Wilson Memorial Branch of Childhaven ("Childhaven"), a therapeutic care facility for children between one month and five years of age who are referred by Child Protective Services, a division of DSHS. Sometime during the 1993/94 school year, Mr. Aponte developed a special interest in one of his students, J.J., who had been declared a dependent child within the meaning of RCW 13.34.030 as a result of abandonment by his biological mother. Mr. Aponte took steps toward becoming J.J.'s foster parent, with the long-term goal of adopting him. The transition from Mr. Aponte's being J.J.'s teacher to his being J.J.'s foster parent was scheduled to occur at the end of the school year. In preparation for this transition, in April 1994, J.J. began visiting Mr. Aponte's home, with DSHS approval, once or twice a week for approximately half an hour.
Sometime in May 1994, having been instructed by his then foster mother to take off his clothes and get ready for bed, J.J. responded by saying that Mr. Aponte had told him he didn't need to take any more medicine.[1] When the foster mother inquired further, J.J. informed her that, during a recent visit to Mr. Aponte's home, Mr. Aponte had examined him like a doctor would. The examination included J.J. pulling down his pants and underwear to allow Mr. Aponte to inspect his rear and genitals. In addition, Mr. Aponte used a flashlight to examine J.J.'s ears, nose, and mouth. According to Mr. Aponte, this examination was in response to J.J.'s complaints of itches, rashes, and bruises.[2]
The foster mother reported the incident to DSHS, which initiated an investigation. During the course of its investigation, DSHS learned that, in his role as J.J.'s teacher at Childhaven, Mr. Aponte bathed J.J. approximately once per week. These baths, which were always monitored by other staff at Childhaven, began as a result of J.J.'s hygiene problems, but continued, on the basis of a team decision, because the baths appeared to have a therapeutic effect for J.J. DSHS's investigator viewed these baths, even though within Childhaven's policies, as "red flags." The investigator also expressed concerns about Mr. Aponte's allegedly excessive wiping of children's bottoms in the context of toilet training.[3]
The DSHS investigator ultimately reported "inconclusive" findings, but recommended a sexual deviancy evaluation for Mr. Aponte. The investigator did not review J.J.'s Childhaven file[4] or speak with Mr. Aponte before issuing her report, which falsely alleged that Mr. Aponte, rather than J.J., had removed J.J.'s clothes to perform the examination at issue, and that Mr. Aponte had used a flashlight to inspect J.J.'s genitals.
The DSHS investigator subsequently conveyed misinformation to the social worker at the Sexual Assault Center ("SAC") who was evaluating J.J. The investigator apparently told the SAC evaluator that J.J. had responded "I don't know" to questions about penetration even though J.J. was in fact never *629 asked about the subject. In addition, the investigator led the SAC evaluator to believe erroneously that Mr. Aponte had used a flashlight to inspect J.J.'s genitals, had touched J.J.'s penis, and had conducted the examination while tucking J.J. into bed. Finally, the DSHS investigator expressed to the SAC evaluator a suspicion that, when Mr. Aponte took children on 15-minute therapeutic walks in the neighborhood surrounding Childhaven, he was taking them to his home. Based on the investigator's statements, the SAC evaluator's understanding was that Mr. Aponte lived within a few blocks of Childhaven; in fact, he lived almost a mile away.[5]
The SAC evaluator recommended that the relationship between Mr. Aponte and J.J. be terminated. The SAC evaluator further recommended that Mr. Aponte undergo a sexual deviancy evaluation, after which he should explain to J.J. on videotape that body examinations are inappropriate. The SAC evaluator later admitted that she never investigated Childhaven's policies concerning bathing or body examinations,[6] and that, in hindsight, she wished she had checked on them.
The DSHS investigator informed Mr. Aponte of her recommendation that he submit to a sexual deviancy evaluation. She evidently advised Mr. Aponte that the evaluation would include both a polygraph examination and a penile plethysmograph test,[7] and that the evaluation would cost Mr. Aponte roughly $1,000. Mr. Aponte was making approximately $1,200 per month at Childhaven at the time, and he could not afford the evaluation. In addition, he had concerns about whether the results of a sexual deviancy evaluation would be kept confidential. Mr. Aponte ultimately refused to undergo such evaluation.
As a result of this refusal, in September 1994, DSHS informed Mr. Aponte that it was revoking his foster care license. In addition, citing WAC 388-150-090(3)(c) & (i), DSHS forced Childhaven, via threats of revoking its day care license, to fire Mr. Aponte. Mr. Aponte appealed and, in December 1994, pro bono counsel appeared on his behalf. In mid-January 1995, Mr. Aponte underwent a comprehensive psychosocial evaluation. This evaluation involved approximately ten hours of interviews and psychological testing of Mr. Aponte and a review of varius documents, including numerous letters of recommendation. The evaluator concluded:
[T]here was no evidence ... that suggested the client [Mr. Aponte] currently has, or has ever had, sexual deviancy problems.... [I]t is this evaluator's opinion that any special attention that the client may have paid to J.J. was related solely to his emerging role as J.J.'s foster parent.... Performing a brief body check on a child who is complaining of a rash in his groin area is not generally regarded as inappropriate behavior for a father. However, when this behavior is viewed from the perspective of a teacher conducting the body check in his own home, the standard is different. When held to this highest standard, the client may have been guilty of a lack of judgment. To attribute sexual intent to his actions is a conclusion that does not appear to be supported by the facts in the case.
In summary, the client's situation with regard to his dual role as foster parent/teacher was one in which problems were bound to occur. It is this evaluator's opinion ... that neither grooming behavior nor inappropriate sexual conduct took place on the part of the client. While the *630 present assessment does not specifically address a number of ancillary issues that would typically be covered in a sexual deviancy evaluation, not even a sexual deviancy evaluation can determine absolutely whether or not sexual misconduct has occurred in any given situation.
The $750 fee for the psychosocial evaluation was paid by Mr. Aponte's counsel.
In late-January 1995, an Administrative Law Judge ("ALJ") conducted a three-day hearing on this matter. In March 1995, the ALJ issued an initial decision, in which she concluded that DSHS's investigation concerning Mr. Aponte was "sloppy" and tainted by prejudicial misinformation. In essence weighing the evidence of Mr. Aponte's "good character" against the "red flags" alleged by DSHS, the ALJ determined that a sexual deviancy evaluation for Mr. Aponte was not "necessary" and reinstated Mr. Aponte's foster care license Shortly after the ALJ issued her decision, Childhaven rehired Mr. Aponte.
On review of the ALJ's initial order, a Review Judge in DSHS's Office of Appeals (the "Review Judge") reached the opposite result. In so doing, the Review Judge took note of statutory amendments that went into effect after the ALJ rendered her initial decision, specifically:
In any adjudicative proceeding regarding the ... revocation of a foster family home license, the department's decision shall be upheld if there is reasonable cause to believe that:
....
(b) The ... licensee has failed or refused to comply with any provision of chapter 74.15 ... or the requirements adopted pursuant to such provisions....
RCW 74.15.130(2) (enacted by Laws of 1995, ch. 302, sec. 5). The Review Judge, however, observed that, because no factual dispute existed concerning Mr. Aponte's refusal to submit to a sexual deviancy evaluation, the relevant inquiry under either the previous[8] or the amended standard was whether the requested sexual deviancy evaluation was "necessary."
For purposes of determining whether the evaluation was "necessary," the Review Judge adopted an "arbitrary and capricious" standard. Applying that standard, the Review Judge concluded that sufficient "red flags" existed to justify DSHS's request for a sexual deviation evaluation.[9] The Review Judge therefore entered a final order revoking Mr. Aponte's foster care license for failure to comply with DSHS's demand. In addition, the Review Judge disqualified Mr. Aponte from further employment at a licensed day care facility.
Mr. Aponte sought judicial review pursuant to the Washington Administrative Procedure Act ("APA"). DSHS withdrew from the Superior Court's consideration the issues related to Mr. Aponte's employment at a licensed day care facility. As a result, the Superior Court vacated the portion of the Review Judge's decision disqualifying Mr. Aponte from such employment. With regard to Mr. Aponte's foster care license, the Superior Court concluded that the Review Judge committed an error of law in retroactively applying RCW 74.15.130(2). The Superior Court reasoned that the statutory amendments constituted substantive changes in the law in that they shifted the burden of persuasion *631 from the agency to the licensee and increased the licensee's burden of proof. The Superior Court therefore vacated the Review Judge's decision and adopted the ALJ's findings of fact.
As to whether a sexual deviancy evaluation was necessary, the Superior Court opined that the ALJ applied the correct legal standard, i.e., whether the evaluation was "essential; an indispensable item; determined or produced by the previous condition of things; absolutely needed." On the other hand, the Superior Court reasoned, even if the standard adopted by the Review Judge was appropriate "[t]he CPS investigation was so appallingly lacking that any request for sexual deviancy evaluation based upon that investigation is arbitrary and capricious." The Superior Court thus reinstated Mr. Aponte's foster care license. DSHS now appeals.

Standard of Review
In reviewing administrative action, this Court sits in the same position as the Superior Court, applying the standards of the APA directly to the record before the agency. Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993). Under the APA, a reviewing court may reverse an agency adjudicative[10] decision if, inter alia: (i) the agency erroneously interpreted or applied the law; (ii) the agency's decision is not supported by substantial evidence;[11] or (iii) the agency's ruling is arbitrary or capricious. Id.; see RCW 34.05.570(3)(d), (e), (i). The party challenging an agency's action bears the burden of demonstrating the invalidity of the decision. RCW 34.05.570(1)(a).

Retroactivity
The parties devote substantial attention to the question whether the Review Judge erred in retroactively applying RCW 74.15.130(2), which requires that DSHS's decision to revoke a foster family home license be upheld if there is reasonable cause to believe that the licensee failed or refused to comply with statutory or regulatory requirements. This issue, however, appears irrelevant because the Review Judge did not in fact retroactively apply the standard in RCW 74.15.130(2). The Review Judge stated:
There is no factual dispute that the Appellant has refused to provide this information, so under either the old preponderance of the evidence standard or the new reasonable cause to believe standard, the Department's revocation of the Appellant's license was appropriate if the sexual deviancy examination requested is necessary.
The Review Judge was correct in concluding that the standard of review was immaterial. Mr. Aponte's refusal to submit to a sexual deviancy evaluation was undisputed. The question therefore was not whether the agency had sufficient evidence of his refusal, but rather whether the relevant regulations required him to submit to the evaluation in the first place.[12] As to this latter issue, we *632 believe the Review Judge's analysis of the applicable regulations is flawed.

Mandatory Versus Discretionary Revocations
This Court reviews the interpretation of statutes and implementing regulations under the error of law standard, pursuant to which the Court may substitute its judgment for that of the agency, although substantial weight is accorded to the agency's view to the extent the subject matter falls within the agency's area of expertise. Northwest Steelhead & Salmon Council of Trout Unlimited v. Washington State Department of Fisheries, 78 Wash.App. 778, 786-87, 78 Wash.App. 1000, 896 P.2d 1292 (1995); Harold LeMay Enter, v. Utilities & Transp. Comm'n., 67 Wash.App. 878, 881, 841 P.2d 58 (1992). Here, to the extent DSHS interprets the regulations at issue as defining a particular standard of review or burden of proof, DSHS's view is not entitled to special deference. Cf. Russell v. Department of Human Rights, 70 Wash.App. 408, 412, 854 P.2d 1087 (1993), review denied, 123 Wash.2d 1011, 869 P.2d 1085 (1994) ("[T]he Department is entitled to no special deference regarding th applicability of CR 15(c), because an agency has no special expertise in interpreting court rules.").
The regulation of primary concern is WAC 388-73-036(2)(k), which reads:
(2) The department may deny, suspend, revoke, or not renew a license for failure to comply with the provisions of chapter 74.15 RCW, and rules contained in this chapter. The department shall deny, suspend, revoke, or not renew for any of the following reasons:
....
(k) Refusal or failure to supply necessary additional department requested information.
(Emphasis added.) In interpreting this regulation, the following canons of construction are relevant: (i) courts must give effect to every word, clause, and sentence whenever possible; no part should be deemed inoperative or superfluous unless the result of obvious mistake or error;[13] (ii) when both "may" and "shall" are contained in the same provision, "may" presumably indicates a permissive duty, while "shall" indicates a mandatory duty;[14] and (iii) words should be given their ordinary or plain meaning absent ambiguity or statutory/regulatory definition.[15]
With the guidance of these canons, we construe WAC 388-73-036(2) as follows. The first sentence of WAC 388-73-036(2) authorizes, but does not require, DSHS to revoke a license for failure to comply with the statute or implementing regulations. On the other hand, under the second sentence of WAC 388-73-036(2), if one of the acts or omissions enumerated in subsections (a) through (k) occurs, the department has a mandatory obligation to deny, suspend, revoke, or not renew the license. The implication is that the reasons listed in subsections (a) through (k) constitute such egregious acts or omissions that the department would be remiss in its duties by allowing the licensee to continue having responsibility for children. See, e.g., WAC 388-73-036(2)(a) ("Obtaining or attempting to obtain a license by fraudulent means or misrepresentation"); WAC 388-73-036(2)(c) ("Permitting, aiding, or abetting the abuse, neglect, exploitation, or cruel or indifferent care to a person under care"); WAC 388-73-036(2)(g) ("Failure to provide adequate supervision to a person under care").
Given the inferences to be drawn with regard to the listed acts and omissions, they should be narrowly construed so that DSHS's discretion in licensing matters is not unduly restricted. The Review Judge, however, opted for a liberal construction in concluding that the term "necessary" as used in *633 WAC 388-73-036(2)(k) should be given a meaning consistent with the arbitrary or capricious standard. This interpretation renders the first sentence of WAC 388-73-036(2) almost superfluous, contrary to one of the canons of construction, and we reject it. Rather, in the context of WAC 388-73-036(2)(k), necessary should be given its plain meaning, i.e., "that cannot be done without: that must be done or had: absolutely required: ESSENTIAL, INDISPENSABLE." WEBSTER'S THIRD NEW INT'L DICTIONARY 1511 (1976). Applying this definition, if a sexual deviancy evaluation is absolutely required and the licensee refuses to submit to one, then DSHS must deny, suspend, revoke, or not renew the license and it has no discretion in this regard.
Mr. Aponte would have the inquiry end here; he would have the Court decide that, in the event a sexual deviancy evaluation is not proven "necessary," he need not submit to one or suffer any ill consequences as a result of his refusal. This argument (like the Review Judge's interpretation) ignores the first sentence of WAC 388-73-036(2), as well as WAC 388-73-030, which provides:
(1) The ... licensee ... shall be a person of good character.
(2) The licensee ... shall demonstrate that the licensee ... and other person having access to a person under care have the understanding, ability, physical health, emotional stability, and personality suited to meet the physical, mental, emotional, and social needs of the person under care.
....
(4) The department may, at any time, require the licensee ... to provide additional information so the department can determine whether the licensee ... and other person having access to children in care meet the qualifications in subsections (1), (2), and (3) of this section. This information may include, but is not limited to:
(a) Sexual deviancy evaluations;
(b) Substance and alcohol abuse evaluations;
(c) Psychiatric evaluations;
(d) Psychological evaluations; and
(e) Medical evaluations.
(Emphasis added.) WAC 388-73-030(2) places the burden on the licensee to establish his or her "fitness" to obtain and maintain a foster care license. WAC 388-73-030(4) authorizes the department, at any time, to require a sexual deviancy evaluation to assess "fitness." Because demonstrating "fitness" is the licensee's burden, if the licensee refuses to submit to a requested sexual deviancy evaluation, the licensee has failed to comply with an applicable regulation, namely WAC 388-73-030(2). Pursuant to the first sentence of WAC 388-73-036(2), DSHS would then have the discretion to deny, suspend, revoke, or not renew the license.[16]
To summarize, we hold that the proper inquiry under WAC 388-73-036(2) is two-fold: (i) whether a sexual deviancy evaluation is "necessary" so as to eliminate DSHS's discretion and mandate the revocation of a foster care license upon refusal to submit to such evaluation; and (ii) if not, whether DSHS may properly exercise its discretion to revoke such license based on the refusal to submit to an evaluation. With regard to the first question, our review is guided by the substantial evidence standard outlined in RCW 34.05.570(e); as to the second question, we evaluate the revocation under the arbitrary or capricious standard.[17]
Turning to the first question, we conclude the Review Judge committed an error of law by applying an incorrect standard in evaluating whether a sexual deviancy evaluation was "necessary" for Mr. Aponte. See RCW34.05.570(d). Under the error of law standard, we are entitled to substitute our interpretation of the law for that of the agency. Pasco Police Officers' Ass'n v. City *634 of Pasco, 132 Wash.2d 450, 458, 938 P.2d 827 (1997). Applying the correct standard under WAC 388-73-036(2)(k), the inquiry becomes whether substantial evidece supports the conclusion that a sexual deviancy evaluation was absolutely required. Evidence is "substantial" if it would "convince an unprejudiced, thinking mind of the truth of the declared premise." Batchelder v. City of Seattle, 77 Wash.App. 154, 158, 890 P.2d 25, review denied, 127 Wash.2d 1022, 904 P.2d 1157 (1995).
Here, the evidence of sexual grooming is so minimal and ambiguous that it cannot justify the conclusion a sexual deviancy evaluation was absolutely required. The baths at issue were sanctioned by Childhaven and conducted within its guidelines. In addition, the allegation of excessive wiping of children's bottoms was apparently attributable to non-uniform conduct among Childhaven staff.[18] Finally, the examination of J.J. did not involve any inappropriate touching of the child and was consistent with J.J.'s medical history. Because a sexual deviancy evaluation was not "necessary," DSHS was not required by WAC 388-73-036(2)(k) to revoke Mr. Aponte's foster care license, and the Review Judge erred in relying on the mandatory provision to uphold the revocation.
Our inquiry, however, does not end here. We must next address the question whether DSHS acted arbitrarily or capriciously in exercising its discretion to revoke Mr. Aponte's foster care license.[19] An agency decision is arbitrary or capricious if it is "willful and unreasoning action in disregard of facts and circumstances." Washington Waste Sys., Inc. v. Clark County, 115 Wash.2d 74, 81, 794 P.2d 508 (1990). Here, although we are cognizant that Mr. Aponte could not easily afford, and perhaps had legitimate concerns about the nature[20] and confidentiality of the results of, a sexual deviancy evaluation, and while we agree that DSHS's investigation in this case was substandard, we are not convinced that DSHS acted in disregard of facts and circumstances in revoking Mr. Aponte's foster care license.
Read together, WAC 388-73-030 and the first sentence of WAC 388-73-036(2) grant broad (but not unfettered) discretion to DSHS. This level of discretion is consistent with the Legislature's express declaration that:
[N]o person or agency has a right to be licensed under this chapter to provide care for children. The health, safety, and well-being of children must be the paramount concern....
Children placed in foster care are particularly vulnerable and have a special need for placement in an environment that is stable, safe, and nurturing. For this reason, foster homes should be held to a high standard of care, and department decisions regarding denial, suspension, or revocation of foster care licenses should be upheld on review if there are reasonable grounds for such action.
Laws of 1995, ch. 302, sec. 1; see also Waggoner v. Ace Hardware Corp., 134 Wash.2d 748, 755, 953 P.2d 88 (1998) ("[W]here a former statute is amended, such amendment is strong evidence of legislative intent of the first statute."). In light of this legislative pronouncement, we are of the opinion that DSHS's request for a sexual deviancy evaluation was adequately supported by the (albeit minimal) "red flags" of Mr. Aponte's examination *635 of J.J.'s rear and genitals and his failure to record the examination and complaints leading thereto in J.J.'s Childhaven file.[21] Under WAC 388-73-030, DSHS was entitled to conclude, as a result of Mr. Aponte's refusal to undergo an evaluation, that he had not met his burden of establishing good character. Given that Mr. Aponte did not have a right to be a foster care parent,[22] DSHS's decision to err on the side of caution and revoke his foster care license was not arbitrary or capricious. We reverse the Superior Court's ruling to the contrary.

Attorneys' Fees
DSHS contends that, even if Mr. Aponte ultimately prevails, he is not entitled to attorneys' fees under the state Equal Access to Justice Act ("EAJA") because DSHS's actions were "substantially justified." We disagree. RCW 4.84.350(1) provides: "[A] court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified." Here, Mr. Aponte was forced to seek judicial review of DSHS's decision disqualifying him from further employment at a day care facility. Mr. Aponte's counsel fully briefed this issue to the Superior Court before DSHS withdrew it from consideration. Given DSHS's capitulation on the issue, we are hard pressed to see how DSHS has met its burden of demonstrating the decision to disqualify Mr. Aponte from employment was substantially justified. See Sneede v. Coye, 856 F.Supp. 526, 530-31 (N.D.Cal.1994) ("[I]t is the government's burden to demonstrate that fees should nonetheless be denied.... The term substantial justification' requires the agency to show that its position has a reasonable basis in law and fact.'") (quoting Pierce v. Underwood, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).
According to the affidavit of Mr. Aponte's counsel, as of the time of oral argument before the Superior Court, the total fees incurred in connection with this matter were $94,981, of which $58,186 were attributable to the proceedings before the Superior Court. On appeal, DSHS has not disputed these calculations. Of the fees associated with judicial review, over $50,000 were incurred before DSHS withdrew the employment issue from consideration. Thus, we are satisfied that the attorneys' fees reasonably incurred with respect to the employment issue prior to DSHS's concession on the matter exceeded the maximum amount awardable under the EAJA ($25,000), and we uphold the award of fees. See RCW 4.84.350(2).
Reversed in part, affirmed in part.
COX and BECKER, JJ., concur.
NOTES
[1] J.J. apparently had a history of rashes necessitating the application of A + D ointment.
[2] Childhaven maintains a file on each child served by its facility. Whenever medication is given, a notation must be made in the child's file. In addition, observations concerning each child's physical and emotional status are recorded on a daily basis in their respective charts. On this particular occasion, Mr. Aponte neglected to record J.J.'s complaints.
[3] In its briefing, DSHS raises an issue regarding Mr Aponte's previous practice of kissing children on the mouth. The DSHS investigator did not include this information in her report and apparently did not rely on it in forming her opinion. In addition, according to the program director at Childhaven, after Mr. Aponte was cautioned against this behavior, no further problems were encountered.
[4] The investigator acknowledged that, at the time she wrote her report, she was unaware that J.J. was uncircumcised, a condition that generally results in more infections and discomfort.
[5] The SAC evaluator's notes indicate she was also misinformed that "other children have made concerning statements about [Mr. Aponte] touching their privates." The DSHS investigator, however, denies having said anything of this nature to the SAC evaluator.
[6] Childhaven requires its teachers to visually inspect each child on a daily basis, to check for bruises, rashes, or other marks. If a child complains of irritation in a private area, a Childhaven teacher has a responsibility to discuss the matter further with the child and, if appropriate, remove the child's clothing and visually examine the area of discomfort.
[7] In her later testimony concerning this discussion, the investigator was equivocal concerning whether she told Mr. Aponte he would need to undergo polygraph and plethysmograph tests. Mr. Aponte's recollection, however, was quite clear on the subject, and DSHS's expert witness, Roger Wolfe, confirmed that a plethysmograph examination is "fairly central" in evaluating sexual deviancy.
[8] The Review Judge opined that the previous standard required a licensee to prove by a preponderance of the evidence that "they didn't do what they were alleged to have done" or to present "mitigating circumstances." The Review Judge cited no authority for this allocation of burdens and the parties have provided no further explanation.
[9] The Review Judge discounted the results of the psychosocial evaluation conducted in January 1995. She was unimpressed with the evaluator's credentials (Ph.D. in clinical psychology from the University of Washington, with an entry-level or "affiliate" certification from the state to conduct sexual deviancy evaluations and treatment) and criticized the evaluation as shoddy and failing to adequately probe Mr. Aponte's sexual history. In reaching this conclusion, the Review Judge cited primarily to the cross examination of the evaluator, during which counsel for DSHS accused the evaluator of copying portions of her report verbatim from letters written by Mr. Aponte. The evaluator denied having done so, explaining that, by the time she interviewed Mr. Aponte approximately eight months after the incident at issue, he had probably repeated his recollection of events so many times that his statements were virtually rote.
[10] DSHS devotes much of its opening brief to the application of the arbitrary and capricious standard for review of non-adjudicative agency actions. DSHS's argument is misplaced. Mr. Aponte sought judicial review of the final agency order revoking his foster care license. Although analysis of the revocation decision necessarily involves review of the agency's decision to require a sexual deviancy evaluation, the order at issue stems from an adjudicative proceeding, and the proper standard of review is defined by RCW 34.05.570(3).
[11] The parties here debate which findings, the Review Judge's or the ALJ's, are relevant on review. Pursuant to RCW 34.05.464, the Review Judge's findings of fact, to the extent they modify or replace the findings of the ALJ, are pertinent on appeal. Tapper, 122 Wash.2d at 406, 858 P.2d 494.
[12] Moreover, because RCW 74.15.130(2) articulates the standard for reviewing a decision to revoke a foster family home license, not the standard for making the decision, and because the amendment was in effect when the Review Judge issued her final order, application of the new provision would not have been retroactive. See Effective Dates of Laws, RCW Title 74 (Supp. 1998) at xv-xvii (effective date July 23, 1995); compare Review Decision and Final Order (issued February 15, 1996). In addition, even if the amendment altered the standard for revoking a licensing, rather than the standard for reviewing the revocation, the Review Judge would have been bound to apply the new provision because it was in effect at the time of her decision. See Talanoa v. INS, 397 F.2d 196, 200 (9th Cir.1968) ("It is settled that when the law is changed before a decision is handed down by an administrative agency, the agency must apply the new law."); Inland Empire Distrib. Sys., Inc. v. Utilities & Transp. Comm'n, 112 Wash.2d 278, 283, 770 P.2d 624 (1989) (federal decisions "are persuasive authority when construing state acts which are similar to the federal act.").
[13] Cox v. Helenius, 103 Wash.2d 383, 387-88, 693 P.2d 683 (1985).
[14] Carrick v. Locke, 125 Wash.2d 129, 142, 882 P.2d 173 (1994)
[15] E.g., Garrison v. Washington State Nursing Bd., 87 Wash.2d 195, 196, 550 P.2d 7 (1976).
[16] Mr. Aponte has not challenged the regulations at issue as being outside the scope of authority granted by the Legislature to DSHS.
[17] Among the standards of review enumerated in the APA, the "arbitrary or capricious" standard is the only one that addresses discretion in decisionmaking. See RCW 34.05.570(3)(a) (constitutional violation), (b) (outside scope of authority), (c) (unlawful procedure), (d) (error of law), (e) (not supported by substantial evidence), (f) (all issues not decided), (g) (disqualification), (h) (inconsistent with agency rule); (i) (arbitrary or capricious).
[18] As Mr. Aponte's counsel explained: "[T]he problem was Ms. Underwood was doing it [wiping] too little, Mr. Aponte was doing it too much. She [the program director] got the two of them together and got them coordinated and put in a plan to deal with it, and that was the end of it." DSHS did not offer any contrary testimony.
[19] Although the Review Judge's final decision approving the revocation did not rely upon DSHS's discretionary authority, in the letter advising Mr. Aponte of the revocation, DSHS cited the discretionary provisions of WAC Chapter 388-73.
[20] DSHS argues to the contrary, but the record indicates Mr. Aponte was informed that a sexual deviancy evaluation would include a plethysmograph. The reliability of this "invasive and degrading procedure" in assessing sexual deviancy or predicting future behavior has not been established. See Parker v. Parker, 91 Wash.App. 219, 957 P.2d 256, 257, 259-60 (1998). Mr. Aponte, however, does not point to the plethysmograph as a reason for his refusal to submit to the evaluation.
[21] DSHS proposes additional "red flags" as justifications for its evaluation request, but we find that the serious deficiencies in DSHS's investigation, especially the failure to ascertain and/or properly consider Childhaven's policies concerning bathing and body examinations, tainted all other evidence offered by DSHS. We therefore disregard all but the examination and failure to record, and find them together sufficient because they indicate at least two possibilities (e.g., sexual grooming, or an appropriate response to a child's complaints combined with negligent recordkeeping), one of which is of concern significant enough to warrant a request for a sexual deviancy evaluation.
[22] In contrast, Mr. Aponte had significant rights with respect to his employment at Childhaven and, had the issue been before us, we would probably have reached a different result concerning DSHS's exercise of discretion disqualifying Mr. Aponte from further employment at a day care facility. Cf. Laws of 1998, ch. 314, sec. 6 ("no unfounded report of child abuse or neglect may be used to deny employment") (amending RCW 74.15.130(2)).