[No. 34143-3-II.   Division Two.   October 10, 2006.]

DOSIA NORDLUND, *Appellant*, v. THE EMPLOYMENT SECURITY DEPARTMENT, *Respondent*.

*Marcus R. Lampson* (of *Unemployment Law Project*), for appellant.

*Robert M. McKenna, Attorney General,* and *David I. Matlick, Assistant,* for respondent.

¶1 HUNT, J. — Dosia Nordlund appeals the superior court's affirmance of the Employment Security Department commissioner's denial of unemployment benefits. She argues that the commissioner (1) erred in finding that she voluntarily quit employment without good cause and (2) misapplied RCW 50.20.050, RCW 50.20.060, and the "constructive quit"[1] doctrine. Agreeing with the superior court, we affirm the commissioner's order.

---

[1] The constructive quit doctrine allows an employer to treat a discharged employee as though the employee voluntarily quit, thus precluding unemployment benefits. *Bauer v. Employment Sec. Dep't,* 126 Wn. App. 468, 478, 108 P.3d 1240 (2005).

## FACTS

### I. EMPLOYMENT TERMINATION

¶2 From January 21, 2002, through December 15, 2003,[2] Dosia Nordlund was employed as a "Group Administrative Assistant" for Expedia, Inc., in Tacoma. Her last day of work at Expedia was Thursday, October 30, 2003. From Friday, October 31, through Friday, November 7, Nordlund was absent due to personal illness.

### A. Mother's Illness and Subsequent Death

¶3 The following Monday, November 10, Nordlund left a voice mail message on Expedia's company "help line," explaining that she would not be at work because of an emergency.

¶4 The next day, Tuesday, November 11, Senior Human Resources Representative Kristin Brunner telephoned Nordlund; Nordlund told Brunner that her (Nordlund's) mother had unexpectedly taken ill and required her attention. Brunner told Nordlund that (1) Expedia needed certification of Nordlund's mother's illness from her mother's health care provider to determine whether Nordlund's leave of absence could qualify for compensation under the Washington family medical leave act (FMLA) and (2) she (Brunner) would leave the necessary FMLA paperwork with Expedia's front receptionist for Nordlund to pick up.

¶5 According to Nordlund, (1) Brunner also asked Nordlund to return her Expedia keys and badge and (2) Brunner's request confused Nordlund about whether she was still employed with Expedia. Brunner recalled having asked Nordlund to return her keys,[3] but Brunner did not recall having asked Nordlund to return her badge.

---

[2] There is no indication in the record that Nordlund was on bad terms with her employer or that Expedia, Inc., was dissatisfied with her performance during this period of employment.

[3] Brunner further explained that the keys were needed for administrative functions, such as checking the mail.

¶6 On November 13, Nordlund reported to Expedia's front desk, submitted her badge and keys, picked up the FMLA paperwork Brunner had left, and dropped off a letter from her mother's social worker indicating that her mother was going to have liver transplant surgery. Expedia heard nothing more from Nordlund until November 25.

¶7 On Monday, November 24, Nordlund's mother passed away. On November 25, Nordlund left a voice mail message for Brunner, informing Brunner that Nordlund's mother had passed away and that she (Nordlund) might need to travel to Montana to handle her mother's affairs.

¶8 The next day, Tuesday, November 25, Brunner returned Nordlund's phone call and left a voice mail message stating that (1) Expedia would give Nordlund three days bereavement leave and (2) Expedia needed Nordlund's FMLA paperwork by December 8. Believing that the social worker handling her mother's liver transplant had already processed the FMLA paperwork, Nordlund did not return Brunner's phone call. Nor did Nordlund ever again contact Brunner or Expedia.

B. Nordlund's Actions and Failure To Notify Expedia

¶9 On Friday, November 28, Nordlund left for Montana. She did not inform Expedia of her departure or her expected return date; nor did she attempt to make alternative arrangements with Expedia to cover her employment.

¶10 While Nordlund was in Montana, she had her brother, Abraham Hartfield, move her residential address within Tacoma. According to Hartfield, (1) he moved Nordlund's belongings from her original Anderson Street address to a new residence on Trafton Street and (2) although he checked Nordlund's mail at her Anderson Street address during this time, she received no packages or letters there.

¶11 Nordlund returned to Tacoma on December 12. The record does not reflect any attempt by Nordlund to inform Expedia of her return or her new address.

## C. Expedia's Further Attempts To Contact Nordlund

¶12 On December 1 and 3, Brunner left additional voice mail messages at Nordlund's home and on her cell phone voice mail. Nordlund did not respond.

¶13 On December 3, Brunner also drafted a letter to Nordlund, (1) again requesting the FMLA paperwork by Monday, December 8; (2) explaining that without this paperwork, Nordlund's absences would be considered unexcused; and (3) asking Nordlund to contact Brunner about the matter. Brunner sent this letter via United Parcel Service (UPS) to Nordlund's Anderson Street residence. UPS delivered it on December 5. Although the record contains UPS delivery information for this letter, it contains no delivery signature associated with this delivery.

¶14 Having received no reply from Nordlund, Brunner drafted another letter on December 9. In this letter, Brunner asked Nordlund for the FMLA paperwork by December 12 and informed her that if she did not contact Brunner, Expedia would treat her situation as job abandonment. This letter was also delivered by UPS to Nordlund's Anderson Street residence. Unlike Brunner's previous letter, however, the record contains no UPS tracking or delivery information for this letter.

## D. Employment Termination

¶15 On December 19, Brunner drafted a third letter to Nordlund. In this letter, Brunner terminated Nordlund's employment with Expedia for having abandoned her job, and it recorded December 15 as Nordlund's last day of employment. As with her two previous letters to Nordlund, Brunner had UPS deliver this letter to Nordlund's Anderson Street address. UPS delivered the letter on December 22, indicating "front door" as the delivery location. Again, the record contains no delivery signature associated with this delivery, although there is delivery and tracking information.

¶16 According to Nordlund, (1) she did not receive Brunner's voice mail messages or three letters; (2) other packages had been mistakenly delivered to her Anderson Street front-duplex neighbor instead of her rear-unit residence; (3) she was not on pleasant terms with this front-unit neighbor; (4) Nordlund contacted UPS about delivery of the December 3 letter and learned that the UPS driver had left the letter behind a screen door; (5) Nordlund did not have a screen door on her unit, but her front-duplex neighbor did; (6) Nordlund's Anderson Street voice mail did not transfer to her new residence phone number when she moved; and (7) consequently, she lost any pending messages on her Anderson Street home voice mail. Nordlund could not, however, explain why she did not receive voice mail messages on her cell phone.

## II. Procedural History

### A. Denial of Unemployment Benefits

¶17 Around December 18, 2003, Nordlund applied to the Employment Security Department (Department) for unemployment benefits. Expedia objected, replying that Nordlund had abandoned her job when she left employment and failed to respond to numerous letters and voice messages. Nordlund argued that Expedia had wrongfully discharged her on November 16, 2003.

¶18 Because Nordlund failed to respond to the Department's requests for further information, the Department concluded that Nordlund had abandoned her job with Expedia. On January 17, 2004, the Department issued an order denying Nordlund's application for unemployment benefits.

## B. Administrative Appeal

¶19 Nordlund filed an appeal on March 31, 2004.[4] Following a June 25 hearing,[5] an administrative law judge (ALJ) entered findings of fact, including that "[b]y choosing to act in a manner which the claimant knew or should have known would result in discharge, claimant constructively quit employment." Commissioner's R. (CR) at 128. The ALJ ruled, therefore, that Nordlund was disqualified from receiving unemployment benefits under RCW 50.20.050(1)(a), the "voluntary quit" statute.

¶20 The ALJ also entered the following relevant findings on credibility:

(22) We find claimant's testimony credible that she did not receive the letters from Ms. Brunner in December 2003. Her brother, Mr. Hatfield checked the mail daily while he was moving claimant's residence and testifies that he no [sic] mail was received from the employer.

(23) Additionally, UPS indicated that they had left some of the mail in the front screen door. Claimant did not have a front screen door, her neighbor did. She lived in the rear unit and had problems with her neighbor in the front unit. The neighbor was racially antagonistic toward claimant and may have been motivated to accept and retain her mail. For these reasons we find that claimant did not receive the December letters from the employer.

. . . .

---

[4] An administrative law judge (ALJ) determined that Nordlund had good cause for filing a late appeal.

[5] During the administrative hearing, the ALJ initially addressed three issues: (1) whether Nordlund's appeal was timely, filed 30 days after the Department mailed its benefits determination notice; (2) whether Nordlund voluntarily quit her job with Expedia without good cause and, thus, was disqualified from unemployment benefits under RCW 50.20.050; and (3) whether Nordlund was available for and actively seeking work during the weeks at issue. The ALJ determined that (1) under the circumstances, Nordlund's appeal was timely; (2) Nordlund did not qualify for unemployment benefits because she had voluntarily quit her job without good cause; and (3) she was actively seeking and available for work under RCW 50.20.010(1)(c). Nordlund appealed only the second issue to the Department commissioner.

(25) We find claimant's testimony credible that she did not receive messages on her home phone from Ms. Brunner. Our finding is based on claimant's reasonable testimony that when she moved her telephone service to her new residence the telephone company did not transfer her voice messages to the new telephone number.

(26) However, we do not find claimant's testimony credible that she did not receive the two calls Ms. Brunner left on her cell phone. Claimant offered no reasonable explanation why the messages would not have been received. She also offered no documentary evidence such as her cell phone bills for the months of November and December to dispute Ms. Brunner's testimony.

CR at 127-28.

## C. Appeal to Department Commissioner

¶21 Nordlund timely appealed this ALJ order to the Department commissioner, who issued his decision on August 13, 2004. Acting under RCW 34.05.464(4), the commissioner adopted the ALJ's findings of fact and conclusions of law. The commissioner affirmed the ALJ's initial order because Nordlund had made no effort to contact Expedia after November 25, 2003, or to ensure that Expedia had received the FMLA documents, thus effectively abandoning her job. The commissioner further ruled that if RCW 50.20.060 applied, Nordlund's conduct constituted willful misbehavior, thus disqualifying her from unemployment benefits.

¶22 Neither the ALJ nor the commissioner addressed RCW 50.20.050(1)(b)(ii), the illness "safe harbor" provision of the Employment Security Act (ESA), Title 50 RCW.

## D. Appeal to Superior Court

¶23 Nordlund appealed the commissioner's order to the Pierce County Superior Court. The commissioner conceded that RCW 50.20.060 ("willful misbehavior") did not apply and, thus, limited his argument to upholding his order

under RCW 50.20.050 ("voluntary quit" analysis) only. Sitting in its appellate capacity, the superior court affirmed the commissioner.

¶24 Nordlund further appeals.

## ANALYSIS

### I. "Voluntary Quit" Statute and "Illness Safe-Harbor" Provision

¶25 Nordlund argues that she is entitled to unemployment benefits because the illness and subsequent death of her mother are exceptions to disqualification from unemployment benefits under RCW 50.20.050(1)(b)(ii). We disagree.

### A. Standard of Review

■ ¶26 We review the commissioner's decision, rather than the ALJ's initial decision. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 404-06, 858 P.2d 494 (1993) (citing RCW 34.05.464(4)). We sit in the same position as the trial court and apply the APA (Administrative Procedure Act, chapter 34.05 RCW) standards directly to the agency's administrative record. *Superior Asphalt & Concrete Co. v. Dep't of Labor & Indus.*, 112 Wn. App. 291, 296, 49 P.3d 135 (2002) (citing *Tapper*, 122 Wn.2d at 402), *review denied*, 149 Wn.2d 1003 (2003).

■ ¶27 Under the APA, we consider the commissioner's decision to be prima facie correct, and the "burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). We review conclusions of law de novo to determine if the reviewing judge correctly applied the law. *Franklin County Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983).

Under the APA, a reviewing court may reverse an agency's adjudicative decision if, inter alia: (i) the agency erroneously

interpreted or applied the law; (ii) the agency's decision is not supported by substantial evidence; or (iii) the agency's ruling is arbitrary or capricious.

*Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 615, 965 P.2d 626 (1998) (footnotes omitted) (*citing Tapper*, 122 Wn.2d at 402; RCW 34.05.570(3)(d), (e), (i)), *review denied*, 137 Wn.2d 1028 (1999).

## B. The Employment Security Act

■ ¶28 The legislature promulgated the ESA to provide compensation to individuals who become involuntarily unemployed through no fault of their own. RCW 50.01.010; *Tapper*, 122 Wn.2d at 407-08. Courts have held that the legislature intended to compensate both the involuntarily unemployed and the voluntarily unemployed for good cause. *Cowles Publ'g Co. v. Dep't of Employment Sec.*, 15 Wn. App. 590, 593, 550 P.2d 712 (1976), *review denied*, 88 Wn.2d 1001 (1977). But if a claimant leaves work voluntarily without good cause, the ESA disqualifies the claimant and denies her unemployment benefits. RCW 50.20.050(1)(a).

## C. Illness Safe-Harbor Exception

■ ¶29 Nevertheless, RCW 50.20.050(1)(b) provides four instances in which an individual "shall not be considered to have left work voluntarily without good cause,"[6] three of which do not apply here.[7] The instance that applies here is RCW 50.20.050(1)(b)(ii). This statute provides:

(b) An individual shall not be considered to have left work voluntarily without good cause when:

---

[6] The 2003 Washington Legislature amended RCW 50.20.050 to set forth 10 specific instances where a claimant is not disqualified from unemployment benefits. *See* RCW 50.20.050(2). But because Nordlund's claim has an effective date before January 4, 2004, instead, only RCW 50.20.050(1) applies.

[7] The three instances that do not apply to Nordlund here are: (1) leaving work to accept a bona fide offer or bona fide work, (2) leaving work to relocate for the spouse's employment, and (3) that separation from work was necessary to protect the employee from domestic violence. RCW 50.20.050(1)(b)(i), (iii), (iv).

. . . .

(ii) The separation was because of the illness or disability of the claimant or the death, illness, or disability of a member of the claimant's immediate family if the claimant took all reasonable precautions, in accordance with any regulations that the commissioner may prescribe, *to protect his or her employment status by having promptly notified the employer of the reason for the absence and by having promptly requested reemployment when again able to assume employment:* PROVIDED, That these precautions need not have been taken when they would have been a futile act, including those instances when the futility of the act was a result of a recognized labor/management dispatch system.

RCW 50.20.050(1)(b)(ii) (emphasis added).

¶30 During the administrative hearing, Nordlund presented evidence of her mother's illness. On appeal to the commissioner, she asserted that the ESA illness safe-harbor provision should apply. Nordlund is correct. Because her employment absence was due to family illness, the illness safe-harbor provision of RCW 50.20.050(1)(b)(ii) applied. Neither the ALJ nor the commissioner, however, addressed this provision.

¶31 Nonetheless, we address the illness safe-harbor provision's applicability to determine, as a matter of law, whether Nordlund qualified for unemployment benefits. Having done so, we note that applying RCW 50.20.050(1)(b)(ii) would not change the outcome of the case. Were we to remand this case to the office of administrative hearings for review under RCW 50.20.050(1)(b)(ii), Nordlund would not prevail on the facts before us. RCW 50.20.050(1)(b)(ii) requires that unemployment benefit claimants take all reasonable precautions to protect their employment status, including compliance with department regulations, to qualify for protection under the illness safe-harbor provision. Nordlund failed to comply.

¶32 At the time of Nordlund's claim date, former WAC 192-150-055 (2003) required the following:

(1) **General rule**. To establish good cause for leaving work voluntarily because of your illness or disability or the illness,

disability, or death of a member of your immediate family, you must demonstrate that:

(a) You left work primarily because of such illness, disability, or death; and

(b) The illness, disability, or death necessitated your leaving work; and

(c) You first exhausted all reasonable alternatives prior to leaving work, including asking that you be reemployed when you are able to return to work.

(2) **Exception.** You may be excused from failure to exhaust reasonable alternatives prior to leaving work as required by subsection (1)(c) if you can show that doing so would have been a futile act.

¶33 In Nordlund's case, the Commissioner's Record substantially supports the ALJ's findings of fact that Nordlund (1) failed to comply with Expedia's requests for information, (2) failed to make reasonable efforts to keep Expedia informed about her mother's death and her need to take time off from work, (3) failed seek Expedia's permission for an extended absence or to exhaust reasonable alternatives before leaving work without notice to Expedia, (4) failed to tell Expedia that she was leaving the state for Montana for a period of time, and (5) failed to inform Expedia that she changed her Tacoma address while she was in Montana. Moreover, Nordlund never asserted that exhaustion of alternatives would have been futile.

¶34 We hold, therefore, that Nordlund did not qualify for the illness safe-harbor provision of RCW 50.20.050(1)(b)(ii) and former WAC 192-150-055. Accordingly, we affirm the commissioner's denial of Nordlund's claim for unemployment benefits as a matter of law.[8]

---

[8] Nordlund also argues that (1) the ALJ erroneously applied the constructive quit doctrine rejected in *Bauer v. Employment Sec. Dep't*, 126 Wn. App. 468, 478, 108 P.3d 1240 (2005) and (2) the commissioner erred by alternatively ruling that she was disqualified from unemployment benefits under RCW 50.20.060. Because we affirm the commissioner on the voluntary quit ground, we do not address Nordlund's additional arguments.

## II. Attorney Fees

¶35 Nordlund requests costs and attorney fees for work performed at the administrative, superior court, and appellate court levels, payable from the state unemployment fund under RCW 50.32.100, .110, and .160. Because Nordlund has not prevailed at any level, she is not entitled to costs and attorney fees under the statute.

¶36 Affirmed.

Bridgewater and Armstrong, JJ., concur.