# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| MAGDALENE PAL, | No.  50660-2-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | UNPUBLISHED OPINION |
| Respondent. | |

SUTTON, J. — Magdalene Pal appeals the Department of Social and Health Services[1] Board of Appeals' finding that she neglected a vulnerable adult.  Pal argues that the Department erroneously interpreted and applied the statutory definition of neglect and failed to support its finding of neglect with substantial evidence.

We hold that, although the Department did not erroneously interpret and apply the statutory definition of neglect, the finding of neglect was not supported by substantial evidence. Consequently, we reverse the Department's finding of neglect against Pal.  We also hold that the Department's actions were substantially justified, and we therefore deny Pal's request for attorney fees and costs under the Equal Access to Justice Act (EAJA), RCW 4.84.350.

---

[1] Now the Department of Children, Youth, and Families.

FACTS

I. SUBSTANTIVE FACTS

A.     BACKGROUND

Timothy[2] became a Developmental Disabilities Administration (DDA) client in June 2000 when he was 17 years old based on his diagnosis of mental retardation. Timothy experiences paranoia and his ability to care for himself independently is limited. As a result of Timothy's limitations, he qualified for 69 hours of paid personal care services per month through DDA. Timothy completed high school but struggles with reading. In the past, Timothy has lived on his own as well as in residential treatment facilities. Timothy has no known history of self-harm, suicidal ideation, or overdosing on medication.

Timothy has a history of forgetting to take his medications. When Timothy lived on his own, he had an agency care provider who checked in with him and ensured he was taking his medications. In January 2011, Timothy lived at a residential treatment facility and was preparing to move into a mother-in-law suite at Magdalene Pal's home. While living at the residential treatment center, Timothy's medications were kept in a lockbox in the medication room. During "med pass" times, Timothy would go to the medication room and receive his medicine from the facility's staff. Agency Record (AR) at 10; 243.

Pal was a DSHS-authorized caregiver from 2009 until December 2011. Pal lives with her husband, two children, and her mother Raj Pal, who is also a DSHS-authorized caregiver. Pal became Timothy's caregiver in January 2011. When Timothy arrived at Pal's home, the residential

_____

[2] We refer to the vulnerable adult by his first name to protect his confidentiality. We intend no disrespect.

treatment facility dropped him off with a garbage bag containing all of his belongings. Bubble packs of all Timothy's medications were unorganized in the garbage bag. Timothy and Pal worked together to organize his medications into a pill organizer. Timothy was able to identify his medications by their different shapes, sizes, and colors. The following day, Pal called the pharmacy to confirm Timothy's medications and proper dosages.

Pal continued to provide Timothy services until the Department issued a finding of neglect against her in December 2011. Following the finding of neglect against Pal, Timothy continued living at Pal's home, and Raj[3] took over as Timothy's caregiver.

B.    INCIDENT

In early August 2011, Pal told Timothy that in two weeks she would be going out of town for the weekend to visit her in-laws. Pal explained to Timothy that while she was gone Raj would be giving him his meals and medications, and that Timothy could reach Pal by phone any time. Because Raj lived in the home, Raj and Timothy were familiar with each other; Timothy called her "sweet grandma." AR at 22. Pal told Timothy that she'd call to check in regularly. Pal notified Timothy's DDA case manager Ricki Bournival, about the arrangement and Bournival approved it.

Before leaving for her trip, Pal organized Timothy's medications for that evening and the following two days into a pill organizer which designated doses for "a.m." and "p.m." each day. II Report of Proceedings (RP) at 42. The organizer contained five doses of Timothy's medications. The day of Pal's trip, as she was packing up to leave, Timothy came into the house, saw the pill organizer on the counter, and took it. Raj informed Pal that Timothy had taken the pill organizer,

---

[3] Because Raj Pal and the appellant share a last name, we refer to Raj Pal by her first name. We intend no disrespect.

and Pal tried to convince him to return it. Timothy refused to return the pill organizer. Timothy argued with Pal, saying he wanted to keep the medications himself and pointing out that he had been in charge of his own medications when he lived on his own in the past. Timothy argued that he was not a child and took the organizer to his room.

Because Timothy would not return the pill organizer, Pal and Raj adjusted their plan and decided to have Raj check on Timothy and tell him when it was time for him to take his medication. Pal explained to Timothy how the pill organizer worked and showed him that the top of the organizer was his morning dose and the bottom was his evening dose. Timothy indicated that he understood.

Pal then left for her trip. When Raj brought Timothy dinner that evening she assumed he had taken his evening dose because the pill organizer for that day was empty, but the remaining doses were still in the pill organizer. Half an hour later, Timothy told Pal's neighbor that he had taken all of his medication for the weekend. The neighbor then called Pal, who called Raj. Raj went to Timothy's room and asked where the pill organizer was, but he would not tell her. She ultimately found the empty organizer under the couch. Timothy told Raj that he had taken all of the medication so he would not have to take them the following day. Raj called 9-1-1, and Timothy was ultimately transported to the hospital.

At the hospital, Timothy was admitted for observation and psychological evaluation for "altered mental status with possible overdose." AR at 12. Hospital records showed that Timothy had taken excessive amounts of carbamazepine. During a psychological consultation at the hospital Timothy told the provider, "I took too many pills and almost killed myself [be]cause I was agitated and upset." AR at 12. The provider also noted that Timothy acknowledged regret

4

for his actions and did not seem to have an appreciation of the severity of his ingestion. The hospital also ordered a psychiatric consult which found that Timothy had no suicidal ideation at the time he was released. A registered nurse noted that Timothy "accidentally took both a.m. and p.m. meds." The hospital found that Timothy's actions were "an impulsive ingestion." AR at 13.

Timothy was released from the hospital four days after his admission. Upon his release, Timothy returned to his regular living arrangement at Pal's home. Pal continued as Timothy's caregiver for the next four months.

## II. PROCEDURAL FACTS

### A. NEGLECT FINDING

On August 22, 2011, the Department's Adult Protective Services division (APS) received a report that Pal had neglected Timothy. Max Horn, an investigative social worker for APS, initiated his investigation that day. As part of his investigation, Horn interviewed Timothy, Pal, and reviewed collateral documentation. Horn did not interview Raj, Pal's neighbor, or any of the medical providers who treated Timothy during his hospital admission.

On December 20, 2011, the Department mailed Pal a letter notifying her that the Department had made a finding that she had neglected a vulnerable adult by leaving "a vulnerable adult to administer his medications while [she] went out of town for a few days, knowing the vulnerable adult had a history of inaccurate medication administration and that the vulnerable adult was unable to read or write." AR at 2, 224. Pal requested a hearing but was denied for timeliness. *Pal v. Dep't of Soc. & Health Servs.*, 185 Wn. App. 775, 780, 342 P.3d 1190 (2015). After the superior court affirmed her denial, she appealed to this court, and we reversed. *Pal*, 185 Wn. App. at 789. The matter was remanded for a hearing before the Office of Administrative Hearings.

B.     ADMINISTRATIVE LAW JUDGE HEARING

Pal and the Department appeared for a hearing before an administrative law judge (ALJ) on January 8, 2016.  At the hearing, Horn testified that in the course of his investigation he interviewed Timothy, Pal, Timothy's mother, and DDA case manager Ricki Bournival.

Bournival also testified at the hearing.  Bournival testified that Timothy had been one of her clients for about nine years.  Bournival explained the details of a care assessment (ISP) she completed for Timothy in January 2011.  Bournival testified that the care assessment plan listed "client limitations" and "client strengths" which were populated from drop down lists.  I RP 2 at 00-01.  Bournival also testified that she would select anything from a drop down list that could potentially apply to a client.  Bournival explained that the care assessment was primarily to generate the number of hours a DDA client needs as opposed to giving specific instructions to a caregiver.  When asked where a caregiver would turn to find out specifically what she needs to do for a client, Bournival explained:

> Most of the time that is dependent on the client's living situation. . . . [I]n the situation like where Tim was living at [Pal]'s home, it was more of a verbal arrangement and verbal instructions on "This is what Tim benefits from.  This is – these are Tim's strengths. These are his weakness [sic].  This is what he's done in the past.  This is what, you know, would be good in the future."

I RP at 211-12.

At the time the ISP was completed, Timothy was living at a residential treatment facility but had plans to move to Pal's home where he would rent a mother-in-law suite.  Bournival noted that the care assessment identified that Timothy needed "partial physical assistance" with a host of health and safety activities, including: taking medications, avoiding health and safety hazards, obtaining healthcare services, maintaining a nutritious diet, maintaining physical health and

fitness, and maintaining emotional wellbeing. Bournival explained that "partial physical assistance" means "that someone would have to use their body in some way to assist the client." I RP at 196.

Bournival noted that she had left a comment in her assessment for health and safety activities identifying Timothy's need to have assistance with medications. Bournival testified that Timothy had difficulty reading labels and is unable to tell time well, making frequency and dosages difficult for him to manage. Bournival also explained that the comment primarily pertained to Timothy's time at the residential treatment facility where he would go to the medication room to receive his medications from a bubble pack.

Bournival testified that the assessment identified that Timothy needed "some support" for behavioral needs, including "prevention of other serious behavior." I RP at 198. Bournival explained that the "other serious behavior" related to Timothy's paranoia, and that "some support" indicates that

> he needs some support; however, if he were to engage in that behavior it would not necessarily cause an imminent risk of, um – it wouldn't be, like, a death, you know. Um, like, it wouldn't cause death. Whereas, if you're talking about extensive support it's more like if you're not right there to deal with it he could, you know, have some really negative consequence.

I RP at 198.

Bournival explained that the care assessment's notes under "medication management," which listed "put medications in lockbox, remind client to take medications," were based off of what type of assistance Timothy needed in the seven days prior to the assessment. I RP at 199; AR at 243. Bournival testified that she would have clarified Timothy's assistance needs going forward, especially in relation to a change in living environment, in the comments. The comments

in the care assessment stated, "Meds at [the residential treatment facility] are kept in the medication room. Tim goes to the med. room during med. pass times and is handed bubble pack. IP will assist Tim with meds. in his new living situation." AR at 243. Bournival explained that "IP" was in reference to Pal. I RP at 203. Bournival testified that Pal was not instructed to keep Timothy's medications in a lockbox.

Bournival explained that Timothy and Pal established an agreed upon plan for his medication management.

> The informal agreement was that [] she understood that Tim needed help with his medication. And he said it would be okay for her to keep the medications in her home in a cabinet above her refrigerator. So, that was a verbal agreement that he had with her about how she was going to assist him with his medications.

I RP at 214. Bournival explained that Timothy and Pal came to their arrangement together:

> He coordinates his service with his provider. . . . I knew that that was their agreement that [] the meds were going to be kept in the house. He was going to have access to them, when he had access. She was going to remind him to take his medications.

I RP at 214-15. Bournival testified that she was aware of Pal and Timothy's arrangement. Bournival testified that Timothy must have expressly agreed to the arrangement. "[Pal] couldn't just take his meds and take them, you know. They're his medications." I RP at 215.

When asked why Pal arranged to keep Timothy's medicine in her home, Bournival testified that Pal likely wanted to be able to ensure that Timothy was taking his medication as prescribed. Bournival noted that if Timothy had the medication in his room he might lose them, not take them, or forget to refill the prescription.

Bournival testified that she was aware of Pal's plan to go on vacation for the weekend and have her mother remind Timothy to take his medications appropriately. Bournival testified that

8

she "thought it was a good plan," but that it was not her position to approve of the plan, explaining, "Tim is an adult. He has that choice to make." I RP at 220-21. Bournival testified that Pal's plan to pack Timothy's medication into an organizer for her two-day vacation was a reasonable plan. She explained, "Yes, it's a standard plan. It's what everybody does when — when a care provider is not available or if a client leaves to go somewhere, then you — you try to make sure that that client's going to get their medications." I RP at 229. Bournival testified that Pal did not have the authority to tell Timothy he could not have his own medications.

Bournival testified that Timothy had lived on his own for a period of time. While living on his own, Timothy had possession of all of his medications and an agency provider would check in periodically, checking his medications and making sure Timothy had been taking them. Bournival testified that as long as she had been Timothy's case manager, he had never overdosed on medications or been suicidal. Bournival testified that Timothy still lives at Pal's home and his medication management plan remains the same.

At the conclusion of the hearing, the ALJ issued an initial order affirming the finding of neglect. Pal filed a petition for review to the Department's Board of Appeals (Board).

C.    APPEAL TO THE BOARD

A review judge with the Board issued a review decision and final order affirming the ALJ's initial order while amending and supplementing the findings of fact and conclusions of law. The Board entered the following relevant conclusions of law:

> 12. The Appellant challenges *Findings of Fact 4.20, 4.21, 4.25,* and *4.62,* asserting that the findings fail to include the fact that Timothy's ISP does not instruct the care provider about how to provide medication administration assistance and that the Appellant had arranged to call Timothy twice a day in her absence to remind him to take his medications. The first part of the assertion is inaccurate as the ISP

specifically provides: "Provider gives Tim bubble pack for the appropriate time and shows Tim the correct day to punch." These same specific instructions were part of the medication administration at Timothy's previous residence and the ISP specifically instructs that "IP will assist Tim with med[ications]." The ISP states in the *Caregiver Instructions* under the *Medication Management* section: "Put medications in lockbox, Remind client to take medications." The ISP also specifically provides for "partial physical assistance" in the activity of "Taking medications" and "assistance required in **Self Administration** of medication. The author of the ISP, Ms. Bournival, testified at hearing that such "assistance" required the physical presence of the caregiver when Timothy took his medication by "use of her body" and to "make sure that she could keep an eye on" Timothy "making sure that he was taking his medications as prescribed." The ALJ erred in finding that no such specific instructions existed in the ISP and *Finding of Fact 4.46* has been corrected to reflect that such instructions do exist in the ISP.

13. Reading all of these provisions together, it is clear that the Appellant, as Timothy's contracted formal care provider, is required to be present physically when Timothy was taking his medications to ensure he neither under-dosed nor overdosed on his prescribed medications. Although Timothy can self-administer medications to a certain extent by opening containers and putting medications in his mouth, it is clear that he needs a care giver physically present to physically hand him the correct medications as well as to observe and monitor that he is taking the correct dosage at the correct time. This is because Timothy's ISP clearly identifies his medication management as a "complex regimen," and lists Timothy's limitations related to medication management as "does not follow frequency or dosage; poor coordination; forgets to take medications, unable to read/see labels; and unaware of dosages." Allowing Timothy to retain multiple dosages of his medication and then using phone calls from a distant location to remind him to take his medications did not meet the specific requirements of the ISP. Nor did having the Appellant's mother check to see if Timothy had taken his medications when he was allowed to retain the mediset containing multiple medication dosages.

. . . .

16. The Appellant's challenges to *Findings of Fact 4.49* and *4.59*, as well as her proposed additional findings of fact, are based on accepting Ms. Bournival's testimony and beliefs, after the fact, as dispositive of what constituted adequate, non-negligent care for Timothy. As Timothy's DDA primary case manager, as well as author and signatory of the ISP, Ms. Bournival's opinion as to the adequacy of the care provided by the Appellant should be considered. However, her opinions entered after the relevant incident had occurred cannot carry greater weight than the clear care directives set forth in the ISP based on Timothy's established cognitive limitations. As correctly stated in the Department's response, Ms.

Bournival's claim that Timothy had sole personal control over his medications in the past is contradicted by the testimony of Timothy's mother and not supported by the evidence that is most germane to this issue, Timothy's ISP. And finally, it cannot be ignored that Ms. Bournival's testimony in this matter could have been affected by her role in recommending Timothy be initially placed in the Appellant's care, her desire to retain the Appellant as Timothy's caregiver based on past difficulty in placing him, and future special waiver requirements if he is to be moved again. If Ms. Bournival genuinely believed that Timothy could safely retain and administer his medications on his own without any caregiver assistance, as occurred during the incident at issue in this proceeding, she would have, and should have, timely amended his ISP accordingly.

17. . . . . A contracted individual care provider of a vulnerable adult cannot absolve themselves of necessary care duties by simply stating, "it is what the vulnerable adult wants, I am legally bound by state and federal law to honor that choice, and there is nothing I can do." Such an argument undermines the purpose of the ISP and allows the creation of a situation abetting potential serious self-harm to the vulnerable adult. The ISP cannot be interpreted or applied so as to abet self-neglect by a vulnerable adult or to allow circumstances dangerous to that vulnerable adult's health, welfare, and safety. The Appellant's argument is analogous to allowing a cognitively impaired vulnerable adult to go out seriously underdressed into dangerously inclement weather, without further action on the part of the care giver, simply because the vulnerable adult chose to take such dangerous, harmful, and inappropriate action.

18. The evidence in the hearing record supports the facts that Timothy suffers from intellectual disability, "needs a lot of support to stay healthy- someone else must help him identify his health care needs. . ."; "is not able to read the labels on his medication packets and has great difficulty remembering to take meds . . . has great difficulty keeping himself safe"; needs partial physical assistance in taking medications; "continues to struggle with mental health symptoms, mostly feelings of paranoia"; "has great difficulty managing his life due to his inability to read, write, tell time/date . . . his judgment is extremely poor"; assistance is required for self-administration of medication; and in medication administration, his "ability fluctuates, does not follow frequency or dosage, poor coordination, forgets to take medications . . . unaware of dosages." For all of these reasons, when Timothy took sole control over his medications and insisted on retaining them, the Appellant had an obligation to either contact the necessary resources to aide her in regaining physical control of the medications which may have included legal action or, at the very least, to stay within physical proximity of Timothy so as to ensure he neither under-dosed nor overdosed when self-administering the medications he insisted on retaining control over. What the Appellant did do was a relinquishment of responsibility and not "the best she could do under the circumstances."

19.  The Appellant has continuously claimed that no guardianship or other court order existed allowing her to directly countermand Timothy's wishes related to medication self-administration.  Such legal action could only be commenced upon the Appellant immediately contacting Timothy's DDA caseworker and APS to report possible self-neglect or self-abuse by Timothy.  Only upon such notification, would the Department be apprised of the need to begin immediate action to protect Timothy's health and safety.  This may have required immediate emergency legal action to obtain a temporary court order or, at the very least, compelled the Appellant or some other temporarily assigned care provider to continuously monitor Timothy until the time he either voluntarily relinquished the medications or took the retained medications at the proper time and dosage under such constant physical supervision and monitoring.

20.  There exists substantial evidence in the hearing record corroborating the substantiated initial finding of neglect.  By her own admission, what the Appellant did was a "terrible misunderstanding and mistake."  The Appellant initially admitted to the Department investigator that Timothy's medications are normally locked up and she just made a mistake because Timothy "really wanted to do them." This initial admission had a high *indicia of reliability*, as it constituted a statement against self-interest and was made when the Appellant may not have been completely cognizant of the ramifications of admitting she failed to secure the medications and had made a mistake. The Appellant did not challenge her mother's admission that they "treat [Timothy] like a child, like we have another kid beside of [sic] my grandson."  But then failed to explain why they keep medications out of the reach of the young children in the household, but not out of Timothy's reach during the relevant incident.  The Appellant admitted that prior to the incident, the plan was for her mother to "give [Timothy] his meds" while the Appellant was away.  The Appellant's mother admitted that at the time of the incident she was not fully aware of Timothy's care needs and limitations related to medication administration.  The Appellant argues that it is the care plan (ISP) that is critical to whether Timothy was neglected, not his mother's opinions or expectations, but then argues that the specific requirement of the care plan that the care provider provide physical assistance in medication administration can be ignored based on the wishes of the vulnerable adult.  And finally, the Appellant admitted at hearing that she was trained to call Timothy's case manager if she was unable to perform a service for him, but did not do so during the relevant incident.

21.  Based on Timothy's unique individual needs and limitations, the Appellant's failure to take action to insure Timothy did not under-dose or overdose on his medications was an omission that demonstrated a serious disregard of the consequences of such a magnitude as to constitute a clear and present danger to Timothy's health, welfare, or safety, as borne out by his overdosing on his

medications during unsupervised self-medication requiring emergency transportation to, and care at, a hospital. This conclusion is reached accepting the common language usage for the terms "serious disregard" and "clear and present danger."

22. The Appellant's failure to provide physical assistance to ensure adequate supervision and monitoring of Timothy's self-administration of his medications did constitute neglect as defined in former, but applicable, RCW 74.34.020(12)(b) as referenced in and made applicable by the first sentence of WAC 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.

AR at 32-38 (footnotes omitted). Pal appealed the Review Board's order to the superior court, which affirmed. Pal appeals.[4]

## ANALYSIS

### I. LEGAL PRINCIPLES

In reviewing an administrative action, we sit in the same position as the superior court, applying the standards of the Administrative Procedure Act (APA), ch. 34.05 RCW, directly to the record before the agency. *Brighton v. Dep't of Transp.*, 109 Wn. App. 855, 861–62, 38 P.3d 344 (2001). Under the APA, we may reverse an agency adjudicative decision if the agency's decision is not supported by substantial evidence, or is arbitrary or capricious. RCW 34.05.570(3); *Brighton*, 109 Wn. App. at 862. "The party challenging an agency's action bears the burden of demonstrating the invalidity of the decision." RCW 34.05.570(1)(a); *Brighton*, 109 Wn. App. at 862.

Issues of statutory construction are reviewed de novo under the error of law standard. RCW 34.05.570(3)(d); *Life Care Ctrs. of Am., Inc. v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 370,

---

[4] Pal assigns error to the Board's findings of fact 23, 28, 44-46, and 49. Findings to which error has not been assigned are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

374, 254 P.3d 919 (2011). Under this standard, we may substitute our interpretation of the law for the agency's. *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 142-43, 969 P.2d 458 (1999). "Where a statute is within the agency's special expertise, the agency's interpretation is accorded great weight, provided that the statute is ambiguous." *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000). Ultimately, it is for the court to determine the meaning and purpose of a statute. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

"The findings of fact relevant on appeal are the reviewing officer's findings of fact—even those that replace the ALJ's." *Hardee v. Dep't of Soc. & Health Servs.*, 172 Wn.2d 1, 19, 256 P.3d 339 (2011). In reviewing challenged findings for substantial evidence under RCW 34.05.570(3)(e), "substantial evidence is a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *Brighton*, 109 Wn. App. at 862. We neither weigh the credibility of witnesses nor substitute our judgment for that of the agency. *Brighton*, 109 Wn. App. at 862. We review conclusions of law de novo to determine if the reviewing judge correctly applied the law. *Morgan v. Dep't of Soc. & Health Servs.*, 99 Wn. App. 148, 151, 992 P.2d 1023 (2000). And we generally accord substantial deference to agency decisions. *Brighton*, 109 Wn. App. at 862.

## II. STANDARD OF NEGLECT

Pal argues that the Board erroneously interpreted and applied the statutory definition of neglect by impermissibly lowering the statutory standard for a neglect finding and by disregarding a caregiver's duty not to violate a DDA client's right to refuse care services. We disagree.

A.      IMPERMISSIBLY LOWERED STANDARD

Former RCW 74.34.020(12) (2011)[5] defined "neglect," in relevant part, as:

(b) an act or omission that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

Pal argues that the Board impermissibly lowered the statutory standard for a neglect finding in three ways. First, by failing to narrowly construe the statute due to the Abuse of Vulnerable Adults Act's (AVAA's), ch. 74.34 RCW, punitive nature. Second, by relying on the dictionary definitions of "serious disregard" and "clear and present danger" as opposed to the framework set out in *Brown v. Dep't of Soc. & Health Servs.*, 190 Wn. App. 572, 360 P.3d 875 (2015). And third, by employing a hindsight analysis.

1. *Punitive Nature of the AVAA*

Pal argues that because the AVAA is punitive in nature it must be construed narrowly. She urges this court to apply a strict construction of the definition of neglect given the significant consequences of a neglect finding. However, Pal provides no authority that a narrowing of the standard in this case is required or that the failure to explicitly narrowly construe the standard requires reversal. In an attempt to support her position, Pal cites two cases that considered the punitive nature of statutes when interpreting them: *Brown*, 190 Wn. App. at 591-92, and *Crosswhite v. Dep't of Social & Health Servs.*, 197 Wn. App. 539, 552 n. 6, 389 P.3d 731 (2017).

---

[5] Because the incident at issue occurred in 2011, the 2011 version of RCW 74.34.020 is applicable. The statutory definition of "neglect" has remained substantially the same since 2011, however, in 2013 the statute was amended such that subsection (b) included the words "by a person or entity with a duty of care." *See* former RCW 74.34.020(12) (2013). Pal does not contest that she was "a person with a duty of care" to Timothy.

*Brown*, a case about the abuse of children act (ACA), ch. 26.44 RCW, stated that because a finding of neglect of a child can preclude one from obtaining a child care license, statutes relating to a finding of child neglect must be strictly construed. 190 Wn. App. at 591-92. *Crosswhite* stated, "While deferring to agency expertise where appropriate, this court has consistently rejected [D]epartment interpretations of statutes that broaden its authority to take punitive action." 197 Wn. App. at 557.

Pal argues, accurately, that the AVAA has both beneficial and punitive purposes. For instance, a substantiated finding results in the placement of the offender's name on a lifelong public abuse registry which precludes the individual from working or volunteering in positions where she may have unsupervised contact with vulnerable adults. RCW 74.39A.056(2). A finding of neglect also disqualifies an individual from obtaining a number of licenses, including a license for an adult family home or daycare center. RCW 70.127.170(21). A finding of neglect may also disqualify an individual from obtaining any license issued by the Department of Health. RCW 18.130.055(b), RCW 18.130.180(24).

While we acknowledge the significant consequences of a neglect finding, these consequences alone do not require the Board to explicitly narrowly construe the AVAA, nor do they require reversal of the Board's order in this case.

2. *Brown Framework – "Serious Disregard" and "Clear or Present Danger"*

Pal argues that the Board should have adopted the framework for "serious disregard" and "clear or present danger" articulated by Division III of this court in *Brown*, 190 Wn. App. at 590-91. Br. of Appellant at 17.

16

RCW 74.34.020 does not define "serious disregard" or "clear and present danger." Division III of this court established a framework for analyzing "serious disregard" and "clear and present danger" in *Brown*. *Brown* involved an appeal from a finding of neglect of a child against a mother under the ACA, formerly RCW 26.44.020(16) (2012). 190 Wn. App. at 574. Former RCW 26.44.020(16)'s definition of negligent treatment mirrors former RCW 74.34.020(12)'s definition of neglect:

> (16) "Negligent treatment or maltreatment" means an act or failure to act. . . that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

Former RCW 26.44.020(16) (2012).

In *Brown*, Division III of this court rejected the Department's application of a "reasonable person" standard to findings of neglect. 190 Wn. App. at 593. The *Brown* court equated "serious disregard" to "reckless disregard," which our Supreme Court has defined as an intentional act or failure to do an act that it is one's duty to another to do, knowing or having reason to know of "facts that would lead a reasonable person to realize that the actor's conduct not only *creates an unreasonable risk* of bodily harm to the other but also involves a *high degree of probability that substantial harm will result* to him or her." *Brown*, 190 Wn. App. at 590 (emphasis added) (*citing Adkisson v. City of Seattle*, 42 Wn.2d 676, 685, 258 P.2d 461 (1953)). *Brown* also held that the phrase "clear and present danger," suggests "more serious misconduct than mere negligence," and referenced Washington law on freedom of speech, which protects speech "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public

inconvenience, annoyance, or unrest." *Brown*, 190 Wn. App. at 591 (*citing City of Bellevue v. Lorang*, 140 Wn.2d 19, 27, 992 P.2d 496 (2000).

Here, the Board did not consider *Brown* and instead relied on Webster's Third New International Dictionary (1981) to define "serious" as "[g]rave in disposition, appearance, or manner," "disregard" as "[t]o treat without fitting respect or attention," "clear" as "[w]ithout confusion or obscurity," and "present" as "[n]ow existing or in progress." AR at 38, n.216-17. Given former RCW 26.44.020(16)'s nearly identical definition of "negligent treatment," it would have been reasonable for the Board to consider cases such as *Brown* in determining what qualifies as neglect as defined under RCW 74.34.020. Further, the AVAA is similar to the ACA in both structure and purpose. Indeed, courts have looked to relevant ACA jurisprudence as guidance on issues involving the AVAA. *See Kim v. Lakeside Adult Family Home*, 185 Wn.2d 532, 543-44, 374 P.3d 121 (2016) (applying a test from an ACA case to an AVAA case and observing that the AVAA is similar to the ACA and thus ACA case law is persuasive).

While ACA jurisprudence may well be persuasive in many instances, no case has held that a Board's determination under the AVAA is necessarily invalid simply because it does not explicitly adopt standards laid out in ACA cases. Thus, the Board's reliance on the dictionary definitions of "serious disregard" and "clear and present danger" was not improper. Consequently, we reject Pal's argument insofar as she contends that the Board's failure to apply the standard of neglect articulated in *Brown* requires reversal.

3. *Hindsight Analysis*

Pal also argues that the Board improperly relied on hindsight to conclude serious disregard and clear and present danger existed because harm occurred. We agree that the Board's reliance

on hindsight was improper. *Brown*, 190 Wn. App. at 596; *see also In re Dependency of Lee*, 200 Wn. App. 414, 438, 404 P.3d 575 (2017) (holding that the trial court's reliance on hindsight to conclude that parents' rejection of a feeding tube for their medically complex son constituted abuse or neglect was improper). Thus, we analyze whether substantial evidence, absent hindsight analysis, supported the Board's findings of fact in the following sections.

B.    CLIENT'S RIGHT TO REFUSE CARE SERVICES

Pal argues that the Board improperly rejected her argument regarding Timothy's right to refuse care services and concluding that Pal should have taken more drastic action to prevent Timothy from improperly taking his medicine. We agree, but we hold that, on its own, this error does not require reversal.

Pal contends that our Supreme Court's decision in *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 306 P.3d 920 (2013) is illustrative. There, the Supreme Court considered whether a guardian committed statutory neglect by deferring to her client's expressed wishes to live in her home, despite the reality that the client's high care needs and lack of cooperation with caregivers resulted in self-neglect at home. *Raven*, 177 Wn.2d at 809. The Supreme Court unanimously reversed the neglect finding, holding that a guardian's good-faith determination that her ward opposes nursing home placement cannot be the basis for a finding of neglect. *Raven*, 177 Wn.2d at 822, 834.

Although the facts of *Raven* are distinguishable, the *Raven* decision is consistent with Washington's public policy regarding the autonomy of disabled persons. For instance, RCW 71A.10.011 states, "The legislature recognizes that the emphasis of state developmental disability services is shifting from institutional-based care to community services in an effort to increase the

personal and social independence and fulfillment of persons with developmental disabilities, consistent with state policy." Further, WAC 388-825-370 provides that a person providing personal care services to a client must "[a]ccommodate client's individual preferences and differences in providing care, within the scope of the service plan."

Here, Pal believed Timothy had a legal right to possess his medications and that her privilege to handle the medication was contingent upon Timothy's consent. Pal acknowledges that Timothy's right is not absolute, but contends that given his lack of history of overdosing or self-harm, her decision to respect his wishes and alter the care plan accordingly was appropriate.

The Board disagreed and concluded that Pal "had an obligation to either contact the necessary resources to aide her in regaining physical control of the medications which may have included legal action or, at the very least, to stay within physical proximity of Timothy so as to ensure he neither under-dosed nor overdosed." AR at 36 (CL 18). In its conclusion of law 19, the Board concluded that the proper course of action when Timothy chose to retain his medications may have included obtaining "immediate emergency legal action to obtain a temporary court order or, at the very least, compelled the Appellant or some other temporarily assigned care provider to continuously monitor Timothy . . . under such constant physical supervision." AR at 36 (CL 19).

Under the circumstances of this case, the Board's conclusions of law 18 and 19 are at odds with both the legislature's and the Supreme Court's emphasis on maintaining as much autonomy as possible for disabled persons. Although Timothy experiences intellectual disability and has difficulty remembering to take his medications, he—for the most part—lives a relatively independent lifestyle. Nothing in the record establishes that Timothy's insistence on retaining five doses of medicine posed such an immediate risk to his wellbeing that drastic interference with his

20

autonomy was necessary. The Board's conclusions, that Pal had an obligation to physically interfere, invade the private personal space of a legally competent adult, and/or pursue emergency legal action to mitigate Timothy's autonomy, were erroneous.

Consideration of a client's wishes in adjusting a care plan is appropriate and entitled to some weight. However a caregiver cannot avoid a finding of neglect for the sole reason that a vulnerable adult expressed preferences regarding his treatment. Pal's consideration of Timothy's wishes was relevant to, but not dispositive of, a neglect determination.

## III. SUBSTANTIAL EVIDENCE

Pal also argues that the Department failed to provide substantial evidence to support a finding of neglect. Specifically, Pal argues that the Department failed to prove the necessary elements of "serious disregard" and "clear and present danger." Br. of Appellant at 29, 43. We agree.

The AVAA does not define "serious disregard" or "clear and present danger." Here, the Board relied on the dictionary definitions. However, Pal argues that we should adopt the *Brown* framework, which established that the element of "serious disregard" requires that Pal intentionally acted or failed to perform an act which was her duty to Timothy to perform while knowing or having reason to know of facts that would lead a reasonable person to realize her conduct not only created an unreasonable risk of bodily harm but also involved a high degree of probability that substantial harm would occur. *Brown*, 190 Wn. App. at 590. We decline to adopt the *Brown* standard, but nonetheless hold that substantial evidence does not support a neglect finding.

A.      SERIOUS DISREGARD

Pal argues that the Board erroneously concluded that Pal seriously disregarded Timothy's wellbeing by violating her duty to assist Timothy with his medication management because the Board misinterpreted the contents and context of Timothy's ISP.

As an initial matter, Pal argues that the conclusions of law related to Pal's obligations under Timothy's ISP are mislabeled findings of fact and should be analyzed under the substantial evidence standard. Findings of fact are determinations of whether the evidence shows that something existed or occurred. *Casterline v. Roberts*, 168 Wn. App. 376, 382, 284 P.3d 743 (2012). We treat findings of fact, labeled as conclusions of law, as findings of fact when challenged on appeal. *Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986). We agree that Pal's obligations under the ISP are factual questions, and consequently, we treat the Board's conclusions of law on the matter as findings of fact.

Pal assigns error to the Board's conclusion of law 12, which we review as a finding of fact, which found that the ISP's instructions for providing medication administration assistance applied both to Timothy's care at the group home and to Pal. The Board's conclusion stated that the ISP instructions included: "Provider gives Tim bubble pack for the appropriate time and shows Tim the correct day to punch," "IP will assist Tim with meds," "Put medications in lockbox, Remind client to take medications." AR at 32 (CL 12). The Board also found that the ISP specifically provided for "partial physical assistance" for the activity of "[t]aking medications" and "assistance required" for "**Self Administration** of medication." AR at 32 (CL 12). The Board also found that "Bournival, testified at hearing that such 'assistance' required the physical presence of the caregiver when Timothy took his medication by 'use of her body' and to 'make sure that she could

22

keep an eye on' Timothy 'making sure that he was taking his medications as prescribed.'" AR at 32 (CL 12).

Pal also challenges the Board's conclusion of law 13 which stated that the ISP required Pal to be physically present when Timothy took his medications, and that allowing Timothy to retain multiple doses of his medication and remind him to take it by calling him violated the ISP. AR at 32-33 (CL 13).

The ISP did not mandate that Pal be physically present when Timothy took his medications. Bournival's testimony explained that the primary purpose of the ISP was to identify the needs of a vulnerable adult for purposes of calculating how many hours of care he would need.[6] Contrary to the Board's finding, Bournival testified that an ISP does *not* form the basis of what specific actions are required of a caretaker as part of her services. Rather, Bournival testified that the details of a specific care plan would be arranged between the vulnerable adult and the caretaker.

Further, Bournival testified that when she wrote the ISP, Timothy was living at the residential treatment facility and, therefore, much of the ISP did not apply to Pal. For instance, Bournival testified that the ISP's instruction to "put medications in lockbox" did not apply to Pal. 1 RP at 213; AR at 243. Importantly, Bournival testified that of the instructions pertaining to medication management, only the last sentence, "IP will assist Tim with meds in his new living

---

[6] In conclusion of law 16, the Board noted that Bournival's testimony and beliefs should not be accepted as *dispositive* of what constituted non-negligent care for Timothy, and should not carry greater weight than the directives set forth in the ISP. AR at 34 (CL 16). The Board also concluded that her opinion "should be considered," and relied on her testimony throughout its other findings of fact and conclusions of law. AR at 34 (CL 16). In sum, conclusion of law 16 goes to how the Board weighed Bournival's testimony, but does not constitute a finding that Bournival's testimony in its entirety was not credible.

situation," applied to Pal. 1 RP at 202-03; AR at 243. She identified that the details of how Pal would assist Timothy with his medications would be arranged between Pal and Timothy apart from the ISP.

Consistent with the notion that the details of what Pal's assistance of Timothy would entail would be worked out between the two of them, the ISP did not contain any specific directions to Pal or define "assistance." Although the ISP identified that Timothy needed "partial physical assistance" with medications, nothing in the record supports the Board's finding that "partial physical assistance" required Pal's physical presence or for her to physically hand Timothy every dose of his medication. Rather, the evidence in the record shows that in drafting the ISP, Bournival contemplated that Pal and Timothy would work out the details of their arrangement

Additionally, strict adherence to the ISP, or to Pal and Timothy's informal arrangement, is not dispositive of whether Pal acted with serious disregard for Timothy's wellbeing. Bournival testified that Timothy's strengths and weaknesses identified in the ISP were populated from "drop-down" lists, and Bournival selected anything that could potentially apply. I RP at 201-02, 213. Bournival was aware of Pal and Timothy's arrangement and was informed of Pal's alternate plan for while she was out of town.

Substantial evidence does not support the Board's findings that the ISP imposed strict and specific requirements on Pal or that Pal seriously disregarded her duty of care to Timothy because she failed to follow the Board's interpretation of Timothy's ISP.

B.     CLEAR & PRESENT DANGER

Pal also argues that the Department failed to prove that clear and present danger existed when Pal modified the medication administration plan. Specifically, Pal challenges the Board's

conclusion of law 21, which stated in relevant part that Pal's failure to act constituted "a clear and present danger to Timothy's health, welfare, or safety, as borne out by his overdosing on his medications during unsupervised self-medication." AR at 38. We agree.

As previously discussed, a finding of neglect cannot rest on hindsight. As such, the Board's conclusion that Pal's decision to allow Timothy to retain his medication constituted a clear and present danger "as borne out by his overdosing" is improper. AR at 38 (CL 21). The fact that Timothy ultimately did take multiple doses of his medication at once and required medical care as a result does not support a finding that a clear and present danger existed at the time Pal chose to allow Timothy to retain possession of his medications. Likewise, the Board's reliance on Pal's statement after learning of Timothy's overdose that she "made a mistake" by allowing Timothy to retain his medications does not support a finding that Pal seriously disregarded a clear and present danger to Timothy's wellbeing. AR at 37 (CL 20).

Nothing in Timothy's history suggested that the alternate weekend medication plan presented a danger to Timothy's wellbeing. Timothy had no known history of self-harm or suicidal ideation; nor did he have any history of overdosing on his medication. Indeed, the ISP provided that Timothy needed no assistance with "prevention of suicide attempts." AR at 239. The evidence in the record established that Timothy had a history of forgetting to take his medication. Timothy primarily needed caregiver assistance with his medication management because he would lose his medicine or forget to take it. Nothing in Timothy's care plan or his history gave Pal any reason to think that if Timothy retained possession of his medication for two days that he would be at risk of overdosing, particularly given the plan for Pal to check in on him via phone and for Raj to remind him in person to take the proper dosages.

25

Rather, the evidence in the record suggests that Pal's belief that Timothy could safely retain possession of his medications while relying on Pal and Raj's reminders to take it was reasonable. When Timothy lived on his own, he retained full possession of all of his medications. Then, the agency caregiver would occasionally check in to make sure Timothy had been taking his medication and remind him if he had forgotten. During that period, Timothy did not overdose. Nothing in the record suggested any significant change in Timothy's medication management needs after the time he lived alone. Nothing in the record suggested that the residential treatment facility kept Timothy's medications locked up due to any special risk of Timothy overdosing. His identified challenges remained that he would lose or forget to take his medication.

The Board appears to have ascribed significant weight to Pal's statements to hospital staff and Horn that Timothy had told her he was feeling paranoid and wanted to take his own medications. Based on these statements, the Board found that at the time Timothy took the pill organizer, Pal was aware that Timothy was feeling paranoid. However, substantial evidence does not support the Board's finding. The record shows that Timothy was acting relatively normal at the time he took the pill organizer, apart from being frustrated that Pal and Raj tried to convince him to give it back. Pal learned that Timothy was feeling paranoid only after the incident when she spoke to him at the hospital. Moreover, nothing in the record suggested that Timothy's paranoia, even if Pal was aware of it at the time he took the pill organizer, placed Timothy at risk of overdosing or self-harm. The record shows no connection between Timothy's paranoia—typically that the police were coming to get him—and any misuse of Timothy's medicine.

In conclusion, nothing in the record, apart from hindsight, supports the Board's conclusion that Pal seriously disregarded consequences of such a magnitude as to constitute a clear and present

26

danger to Timothy's health, welfare, or safety such that a finding of neglect under RCW 74.34.020(12)(b) was proper. Consequently, we reverse the Board's final order.

## ATTORNEY FEES

Pal argues that she is entitled to attorney fees and costs under the EAJA, RCW 4.84.340-60, should she prevail on appeal. We hold that although Pal is the prevailing party in this action, the Department's action was substantially justified, and therefore, we reject Pal's request for fees and costs.

Under the EAJA, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). "'Substantially justified means justified to a degree that would satisfy a reasonable person.'" *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007) (*quoting Moen v. Spokane City Police Dep't*, 110 Wn. App. 714, 721, 42 P.3d 456 (2002)). And, an action is substantially justified if it had a reasonable basis in law and in fact. *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 623, 965 P.2d 626 (1998). It need not be correct, only reasonable. *Raven*, 177 Wn.2d at 832.

The EAJA contemplates that an agency action may be substantially justified even when the agency's action is ultimately determined to be unfounded. Courts are wary of awarding fees where there is no determination that the Department's actions were arbitrary, willful, or capricious. For example, in *Raven*, our Supreme Court declined to award attorney fees even where Raven was the prevailing party in the action because "an agency would be reasonable in pursuing the same course of conduct that DSHS followed." *Raven*, 177 Wn.2d at 833.

No. 50660-2-II

Here, the Department's actions do not appear arbitrary, willful, or capricious, nor was the Department unreasonable in pursuing its course of conduct in this investigation. Consequently, we reject Pal's request for attorney fees and costs.

Accordingly, we reverse the Department's finding of neglect and decline to award Pal attorney fees and costs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

LEE, A.C.J.

WORSWICK, J.