IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| AKBERET TEKLE, | No. 86862-4-I |
| Appellant, | DIVISION ONE |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | UNPUBLISHED OPINION |
| Respondent. | |

SMITH, C.J. — Many people are unable to provide the amount of care and supervision their vulnerable adult family members need. Society and these families are served by the existence of residential care facilities, which are licensed by the State and allow individuals to live in a residential setting while providing various levels of care and services.

Akberet Tekle was the owner and operator of an adult family home (AFH). In November 2019, in the early morning hours, one of Tekle's residents left the home while unattended. The Department of Social and Health Services (DSHS) cited Tekle for failing to support the resident's safety and failing to report the resident missing. Tekle requested an administrative proceeding, where the administrative law judge (ALJ) affirmed DSHS's decision. Tekle then petitioned for review with the Board of Appeal, which affirmed the ALJ's findings. Tekle

now petitions for judicial review of the Board's decision.  Finding no error, we affirm.

FACTS

Akberet Tekle owned and operated two adult family homes: St. Mary's Adult Family Home and Orchard's Adult Family Home.  Tekle has worked as a caregiver for elderly patients in various settings since 1999.  She opened St. Mary's in 2008 and Orchard's in 2019.

Carl[1] was admitted to Orchard's in September 2019.  Carl had previously been a resident at another AFH, but was asked not to return because of his challenging behaviors.  Prior to Carl's admittance to Orchard's, an Adult Family Home Assessment and Plan of Care were prepared.  According to the assessment, Carl suffered from numerous ailments, including dementia without behavioral disturbances and Alzheimer's disease.  Carl frequently became agitated and knocked against doors, walls, and other objects, resulting in abrasions and bruising to his feet, knees, and legs.

According to Carl's plan of care,

24-hour supervision is required to assist [Carl] with all activities of daily living.  Schedule, meals, medications, and finances must be provided for him.  He can complete some self-care tasks with set up, repeated cueing, and assistance.  He requires accompanying for safety to walk to a safe area in the event of an emergency evacuation.

Carl's care plan did not define "24-hour supervision."  The plan similarly failed to include anything about exit-seeking behavior, but Carl regularly

---

[1] To protect his privacy, only Carl's first name will be used.

attempted to exit Orchard's into the home's backyard. Prior to the incident at issue, Carl had never tried to exit through the front door without permission.

Carl's bed was fitted with an alarm that alerted the caregiver on duty if Carl tried to exit the bed. Orchard's also had an alarm for the front door that sounded anytime someone walked through. When Tekle installed the alarm, she tested it near the front door but did not check to see if she could hear it in other rooms of the home. But Tekle testified she heard the alarm activated many times before the incident in question.

In the morning hours of November 30, 2019, Tekle and her husband were the two sole caregivers on duty at Orchard's. Around 5:00 a.m., Carl awoke and Tekle went to his bedroom. Tekle noticed that Carl had a bowel movement during the night that required cleaning. She cleaned Carl, removed his soiled diaper, and placed him in a wheelchair. Tekle then left Carl in the bedroom while she went to dispose of the garbage and start a shower for him. Tekle testified these activities took her about five minutes. When Tekle returned to Carl's room, she noticed he was missing and began searching the home. Tekle testified she was searching the house when the doorbell rang and Samantha Boyer, a neighbor, brought Carl to the door.

Boyer, who lived in the same cul-de-sac as Orchard's, testified that sometime in the morning on November 30, 2019, she looked out her window and saw an "elderly gentleman with only a sweatshirt on, on his knees in front of his wheelchair, yelling for help." She stated the man—later identified as Carl—was outside for about 30 minutes before she called 911 at 5:38 a.m. After calling

3

911, Boyer went outside to assist Carl. She did not check Carl for injuries, but noticed he had scrapes on his knees and was bleeding. She placed him back in his wheelchair and wheeled him to Orchard's. Although Boyer had recently moved to the area and was not familiar with Orchard's, it was the only house in the cul-de-sac with a wheelchair ramp.

A man answered the door when Boyer knocked. When Boyer asked for "somebody that works here," the man indicated she was asleep. Upon Boyer's request, the man went to get Tekle, who came to the door shortly thereafter. When Boyer inquired if Carl was a resident, Tekle replied, "[h]ow did you know he lived here?"[2] Boyer stated she found him near her house and assumed he lived at Orchard's. Tekle retrieved Carl and brought him back into the home.

Once inside, Tekle checked Carl's temperature, blood pressure, pulse, and oxygen levels. Tekle did not note anything abnormal. She also did not observe any bleeding on his knees or legs. Emergency responders arrived shortly thereafter and performed an evaluation. They did not note anything concerning and left.

Linda Conrad, a nurse delegator for Adult Protective Services (APS), visited Orchard's in December 2019, five days after Carl's incident. Conrad visited the home every 90 days to ensure the clients were "stable and predictable." She had only seen Carl once prior to her December visit. During the December visit, Conrad noted Carl had injuries consistent with the scrapes

---

[2] Tekle testified she responded to Boyer by saying, "yeah, he's my resident."

and bruising she associated with his behavioral disturbances but nothing that required more than superficial wound care.

Mary Boyd, an investigator with APS, spoke with Carl's legal representative and physician after the incident. Neither expressed concerns regarding Carl's safety or his placement at Orchard's.

Shawn Shawnstrom, an AFH licenser with Residential Care Services (RCS), also investigated the November 2019 incident involving Carl. Based on Shawnstrom's investigation, RCS concluded Tekle violated WAC 388-76-10400(b)(3) for failing to actively support Carl's safety on November 30, 2019. Additionally, RCS cited Tekle under WAC 388-76-10225(1)(b)(iii) for failing to report Carl was missing from Orchard's. Following the investigation, RCS required Orchard's to have two caregivers awake and on staff at all times. RCS also imposed a fine. At a follow-up inspection in February 2020, the RCS inspector found no deficiencies and deemed the earlier cited deficiencies corrected.

In June 2020, the Department of Social and Health Services (DSHS) informed Tekle of its determination that she had neglected a vulnerable adult. Tekle requested an administrative hearing to challenge the finding of neglect. At the hearing, Shawnstrom testified DSHS cited Tekle because "the elopement issue was a repeat citation for this home"; at the time Carl went missing, Tekle did not have a safety plan in place; and she did not report Carl's incident to the complaint resolution unit. Shawnstrom noted that, although Tekle seemingly had systems to prevent wandering, they were not sufficient to constitute a safety plan

5

because they did not prevent residents from leaving the home. Tekle's failure to properly implement a safety plan placed Carl's health and safety at risk.

Boyd was not available to testify at trial, but her supervisor, Tom Ellis, provided testimony on her behalf. Ellis testified the finding of neglect by APS was based on "the totality of the evidence, which included documentation showing [Carl] was a vulnerable adult at the time; observations by [Shawnstrom] concerning the alarm; and . . . observations of [Carl] being outside, naked, injured, and below freezing for a significant amount of time." Shawnstrom and Ellis both noted the alarm at Tekle's home was not working at the time of Carl's incident. Tekle testified that after Carl's incident, she discovered the alarm's volume had been turned down, which is why she did not hear it when Carl exited the home.

The ALJ affirmed DSHS's finding of neglect. Tekle petitioned for review with the Board of Appeals, which affirmed the ALJ's finding. Tekle now petitions for judicial review of the Board's decision.

ANALYSIS

Standard of Review

The Administrative Procedures Act (APA), chapter 34.05 RCW, governs this court's review of final agency action. RCW 34.05.570. Relief from an agency order shall be granted only if the court determines:

> (a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
>
> . . .
>
> (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

(d)  The agency has erroneously interpreted or applied the law;

(e)  The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

 . . .

(i)  The order is arbitrary or capricious.

RCW 34.05.570(3).  The party challenging the invalidity of the agency's actions bears the burden of demonstrating a decision is improper.  RCW 34.05.570(1)(a).

### Neglect Standard

Tekle contends the Review Board incorrectly applied the law when affirming the ALJ's finding of neglect, and that the standard of neglect for vulnerable adults is heightened.  Because the Board applied the correct standard, we affirm.

Under RCW 34.05.570(3)(d), this court may grant relief from an agency decision when "[t]he agency has erroneously interpreted or applied the law."  The purpose of the abuse of vulnerable adults act (AVAA), chapter 74.34 RCW, is to protect vulnerable adults from abuse, financial exploitation, and neglect.  RCW 74.34.005.  Under RCW 74.34.020(15),

> 'Neglect' means (a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

"Serious disregard" and "clear and present danger" are not further defined by the statute.

Tekle claims that the definition of "neglect" must be construed narrowly. She relies heavily on the case of *Brown v. Department of Social and Health Services,* 190 Wn. App. 572, 360 P.3d 875 (2015), contending "simple negligence is not enough" and a heightened standard must be applied. In *Brown*, the court reasoned "serious disregard" is akin to "reckless disregard" and requires more than simple negligence. The court stated:

> An actor's conduct is in "reckless disregard" of the safety of another if he or she intentionally does an act or fails to do an act that it is his or her duty to the other to do, knowing or having reason to know of facts that would lead a reasonable person to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him or her.

190 Wn. App. at 590 (quoting *Adkisson v. City of Seattle*, 42 Wn.2d 676, 685, 258 P.2d 461 (1953)). Applying this standard, the court reversed a finding of neglect DSHS made against the mother of an injured child. *Brown*, 190 Wn. App. at 598.

The definition of "neglect" at issue in *Brown* is similar to the AVAA's definition, but *Brown* has been distinguished from cases concerning vulnerable adults. In *Woldemicael v. Department of Social and Health Services*, 19 Wn. App. 2d 178, 182, 494 P.3d 1100 (2021), the court noted "*Brown* is specific to child neglect cases. The relationship between a parent and a minor child implicates the fundamental right to parent where the relationship between a caregiver and a vulnerable adult does not." The heightened standard of review in

8

*Brown* does not apply to vulnerable adult neglect cases. *Woldemicael*, 19 Wn. App. 2d at 180-83. While the court in *Woldemicael* noted the intentionality requirement cited in *Brown* does not apply to vulnerable adults, the court agreed with *Brown* that "serious disregard requires more than simple negligence." 19 Wn. App. 2d at 182. Additionally, courts agree with *Brown* that hindsight may not be used to find neglect based solely on a bad outcome; the circumstances must be examined as a whole. *Crosswhite v. Dep't of Soc. & Health Servs.,* 197 Wn. App. 539, 556, 389 P.3d 731 (2017); *In re Dependency of Lee*, 200 Wn. App. 414, 437, 404 P.3d 575 (2017).

Tekle also relies *on Raven v. Department of Social and Health Services*, 177 Wn.2d 804, 306 P.3d 920 (2013), for her claim that a heightened standard of review applies. This case is also distinguishable. In *Raven*, a guardian for a vulnerable adult was found negligent when they failed to meet professional standards and made the decision to not move the adult to a nursing home. 177 Wn.2d at 815. The Court reversed the finding of neglect, holding, while Raven "exercised poor judgment" in some decision-making, this failure did not amount to neglect and her decision not to pursue out-of-home placement was made in good faith. *Raven*, 177 Wn.2d at 833-34. Unlike Tekle, Raven was a guardian, not an AFH owner and caregiver. Different standards and qualifications apply to a guardian and an owner of an AFH. *Compare* RCW 7.70.065, *with* RCW 70.128.120.

Here, the Board stated in its final order that, while *Brown* was helpful in defining "neglect," the heightened standard does not apply in vulnerable adult

cases.  The Board applied the definition of "neglect" put forth in other vulnerable adult cases, such as *Woldemicael*.  Because the Board applied the correct standard when analyzing neglect in Tekle's case, we affirm.

<u>Findings of Fact</u>

Tekle claims the findings of fact made by the Board in its final order are unsupported by substantial evidence in the record.  Because the record contains substantial evidence to support the Board's findings of fact, we affirm.

When reviewing factual findings, we use the "substantial evidence" test to determine "whether the record contains 'a sufficient quantity of evidence to persuade a fair-minded person of the truth of correctness of that order.' "  *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 588, 90 P.3d 659 (2004) (internal quotation marks omitted) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000)).  Factual determinations will only be overturned if they are clearly erroneous.  *Port of Seattle*, 151 Wn.2d at 588.  This court does not "weigh the credibility of witnesses or substitute our judgement for the [agency's] with regard to findings of fact."  *Port of Seattle*, 151 Wn.2d at 588.

Here, Tekle claims the Board's findings of fact, specifically findings 40, 46, 47, 48, 49, and 50, are unsupported by substantial evidence in the record.  First, finding of fact 40 addresses Tekle's testimony concerning the front door alarm.  Tekle claims the ALJ's conclusion in the initial order that she should have tested the alarm prior to November 30, 2019 is an argument from hindsight.  Tekle admits in a footnote the Board's final order does not include the ALJ's conclusion

regarding testing the alarm, but assumes the Board intended to adopt the finding. But the Board stated the initial order was supported by substantial evidence "with some amendments and deletions." Had the Board intended to adopt the ALJ's specific conclusion regarding the alarm, it would have included it in its findings. Therefore, any argument regarding that specific conclusion is inapplicable because it was not included in the Board's findings of facts.

Findings of facts 46-50 consist of the Board's "credibility findings," and, generally, summarize the testimony of Boyer. The Board noted Carl was "outside unattended for approximately 20 minutes and that he suffered some minor bleeding injuries due to his falling from the wheelchair." Tekle claims the Board did not give an accurate summary of her testimony when they stated "Carl was outside and unattended for significantly longer than the few brief minutes (approximately five) claimed by [Tekle]." In her testimony, Tekle never explicitly said Carl was outside for only five minutes; her testimony was that it took her about five minutes to take out the trash and start the shower. Tekle then testified that it was "two, three minutes, or four minutes" from the time she finished preparing the shower to the time Boyer rang the doorbell.

While the Board does misconstrue Tekle's testimony regarding how long Carl was left unattended, Tekle was not prejudiced by the action. The Board's conclusion was based, in large part, on the credibility of Boyer's testimony, who noted Carl was outside for at least 30 minutes and was bleeding when she found him. Boyer's testimony is not altered by whether Tekle said Carl was outside for only five minutes or any other amount of time. Because these findings involve

11

credibility determinations and are not clearly erroneous, we defer to the Board's credibility determinations.

Tekle also contends the Board erred when it found Carl suffered minor injuries as a result of falling from his wheelchair. Tekle claims the Board failed to consider the examination Linda Conrad, a registered nurse, performed on Carl days after the incident. Conrad noted Carl's injuries were consistent with the typical injuries he sustained from his behavioral issues. But Conrad's testimony is not in conflict with Boyer's testimony that Carl's knees were scraped and bleeding when she saw him outside—Carl could have been injured both in the fall and from his behavioral outbursts. The Board's conclusion that Carl sustained "minor cuts and abrasions" from the incident is not clearly erroneous.

Because the Board's findings of fact are supported by substantial evidence and are not clearly erroneous, we affirm.

<u>Conclusions of Law</u>

Tekle contends the Board's final order was based on erroneous conclusions of law and unlawful procedures. Tekle specifically challenges conclusions of law 13, 14, 21, 23, 24, 25, 26, 27, and 30, which address the elements required for a finding of neglect. Because the Board did not misapply or misinterpret the law and its conclusions are supported by substantial evidence, we affirm.

We review conclusions of law and applications of law to the facts de novo. *Raven*, 177 Wn.2d 804 at 817. While our review is de novo, substantial weight is given to "agency's interpretation of the law it administers, particularly where the

issue falls within the agency's expertise." *Goldsmith v. Dep't of Soc. & Health Servs.*, 169 Wn. App. 573, 584, 280 P.3d 1173 (2012).

For a finding of neglect, DSHS is required to prove that a person with a duty of care to a vulnerable adult commits "an act or omission that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." RCW 74.34.020(15)(b).

1. Act or Omission

Tekle claims the Board's conclusion that she committed an "act or omission" was based on the finding that she failed to provide Carl with 24-hour supervision as required by Carl's plan of care. DSHS contends the finding was based on Tekle's failure to provide adequate supervision and safety precautions, not specifically 24-hour care.

Here, Tekle contends the Board misconstrued what 24-hour supervision required and her actions were not "inconsistent with [Carl's] care plan, much less an act or omission that rises to the level of culpability sufficient to establish neglect." But contrary to Tekle's assertion, the Board noted in its order the "[f]inding that [Tekle] did fail to provide 24-hour supervision as required by [Carl's plan of care] . . . is not, by itself, dispositive of the neglect issue in this case." The Board concluded Tekle's failure to provide adequate supervision—not constant supervision— resulted in neglect.

The Board based its conclusion on the findings that Tekle undertook tasks away from Carl and left him unsupervised for about 20 minutes, which resulted in

13

Carl exiting the AFH. Despite knowing Carl required high levels of supervision and had eloping tendencies, Tekle left Carl unattended long enough for him to exit the house in his wheelchair, where he was alone in the dark in freezing temperatures for about 20 minutes. Tekle testified she had an alarm on the front door, but the volume was not high enough for anyone to hear it activated, rendering it useless. While Tekle was not required to have eyes on Carl at all times, her failure to provide enough supervision to keep Carl from exiting the home and being outside in the cold for more than 20 minutes constitutes an "act or omission" for purposes of the neglect standard.

Because the Board clearly did not base its finding of neglect on a per se violation of Carl's care plan, and it put forth sufficient evidence to show Tekle did not provide sufficient supervision, we conclude Tekle's challenge to these conclusions is unfounded.

2. Serious Disregard of the Consequences

Tekle contends that, even assuming the Board's finding that Carl eloped and was outside for a period of 20 minutes was proper, this conduct does not rise to the level required for a finding of neglect. DSHS claims Tekle's actions rise to a level constituting "serious disregard."

In addition to reiterating her argument regarding the meaning of "24-hour supervision," Tekle notes elopement is a common occurrence in AFHs and Carl had never attempted to exit through the front door. Tekle relies on two unpublished opinions to support her assertion that her conduct did not rise to the level of serious disregard: *Yan v. Pleasant Day Adult Family Home, Inc., P.S.*,

14

No. 68976-2-1 (Wash. Ct. App. Dec. 16, 2013) (unpublished) https://www.courts. wa.gov/opinions/pdf/689762.pdf, and *Ocak v. Department of Social and Health Services*, No. 56862-4-II (Wash. Ct. App. May 23, 2023) (unpublished) https://www.courts.wa.gov/opinions/pdf/D2%2056862-4 II%20Unpublished %20Opinion.pdf.  But the facts of these cases are distinguishable.  In *Yan*, the AFH provider was not informed about the vulnerable adult's exit-seeking behavior or that the adult was recommended to be placed in facility providing a higher level of care.  No. 68976-2-1, slip op. at 2.  Additionally, the provider explicitly told the resident's family they needed to find a new home for the resident after the resident repeatedly fell and eloped from the facility.  *Yan*, No. 68976-2-1, slip op. at 7.

In *Ocak*, the provider was the mother of the vulnerable adult.  The court noted Ocak took numerous actions to prevent her son's elopement, including "installing an alarm system, getting [her son] a GPS watch, moving his bedroom next to her bedroom, taking him outside every day for exercise to alleviate his wanderlust, cultivating relationships with local law enforcement and business owners, calling 911 to report him missing, and working with SMH counselors." *Ocak*, No. 56862-4-II, slip op. at 7-8.  Additionally, the court held it would be against public policy to find family members accountable for neglect every time a developmentally delayed adult being cared for at home eloped.  *Ocak,* No. 56862-4-II, slip op. at 10.

The facts here are more akin to *Kabbae v. Department of Social and Health Services*, where the court affirmed a finding of neglect after a caregiver at

an AFH left three vulnerable adults, who required 24-hour supervision, unattended for at least 20 minutes.[3]  144 Wn. App. 432, 445, 192 P.3d 903 (2008).  Despite knowing Carl suffered from dementia and had eloping tendencies, Tekle left Carl unattended long enough for him to exit the house in the dark, minimally clothed, in freezing temperatures, where he was alone for about 20 minutes.  Tekle should have known a substantial likelihood existed that Carl would try to elope if left alone for an extended period of time.  Because Tekle's conduct was in serious disregard of the potential, harmful consequences to Carl, we conclude her behavior rises to the level required for a finding of neglect.

      3. <u>Clear and Present Danger</u>

Tekle claims the Board relied on hindsight in concluding she put Carl in clear and present danger and the Board overemphasized the dangerousness of the conditions.  DSHS contends, under the circumstances, Carl was put in clear and present danger when he eloped from the home.

Tekle states, "[w]hile every situation of resident elopement is unfortunate, Carl's experience . . . should not be considered any more 'dangerous' than other scenarios that did not warrant findings of neglect."  Tekle cites *Yan* to support her contention, noting that not all elopement cases result in a finding of neglect.  But as discussed above, *Yan* is distinguishable.  Tekle also claims the conditions on the day Carl eloped, including the time of day and weather, were out of her

---

[3] Unlike *Kabbae*, Tekle did not leave Carl alone in the house, but we use this case to demonstrate leaving vulnerable adults unattended for even 20 minutes can constitute neglect.

control, and the Board's comment that "it was only by the grace of fate that [Carl] was not hit and seriously injured" relied on hindsight.

The Board's conclusions were not based on hindsight; its conclusions were based on substantiated findings that a vulnerable adult with dementia was found in the early hours of the morning, in cold temperatures, naked from the waist down, with soiled underwear, and calling for help because he had fallen out of his wheelchair. Hindsight is not required to determine Carl was put in danger because of Tekle's failure to properly care for and supervise him. Additionally, Tekle's claim that she could not control the conditions at the time of Carl's elopement are not persuasive, because what she should have had control over was Carl's supervision.

Tekle had a duty to Carl[4] and she breached this duty by failing to adequately supervise Carl. This failure demonstrated a "serious disregard of consequences of such magnitude as to constitute a clear and present danger" to Carl. We affirm the Board's finding of neglect.

Arbitrary and Capricious

Tekle claims DSHS's actions were arbitrary and capricious. We conclude DSHS's actions were supported by sufficient evidence in the record; therefore, we affirm.

Under RCW 34.05.570(3)(i), a court must grant relief from an agency order "if it determines that . . . [t]he order is arbitrary or capricious." "An agency

---

[4] Neither party contests Tekle had a duty of care to Carl under WAC 388-103-0002.

decision is arbitrary or capricious if it is 'willful and unreasoning action in disregard of facts and circumstances.' " *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 621, 965 P.2d 626 (1998) (quoting *Wash. Waste Sys., Inc. v. Clark County*, 115 Wn.2d 74, 81, 794 P.2d 508 (1990)). When there are multiple, reasonable opinions, " 'action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached' ". *Heinmiller v. Dep't of Health*, 127 Wn.2d 595, 609, 903 P.2d 433 (1995) (quoting *Pierce County Sheriff v. Civil Serv. Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)).

Here, Tekle claims the Board engaged in "irrational and willful conduct," including wrongfully impugning her credibility, refusing to credit her and her husband's testimony, refusing to consider compelling evidence, and failing to follow applicable law. As discussed in the previous section, the Board applied the correct standard of law, its findings were supported by sufficient evidence in the record, and the conclusions of law were supported by the findings. We conclude the Board's final order was not arbitrary or capricious.

### Liberty Interest

Tekle asserts the Board's decision deprived her of protected liberty interests in violation of her constitutional rights. DSHS contends Tekle was provided due process as required constitutionally and under Washington law. We agree with DSHS because the Board's actions were not arbitrary and capricious and Tekle was afforded due process.

Under RCW 34.05.570(3)(a), relief from an agency order shall be granted if the court determines "[t]he order, or the statute or rule on which the order is

based, is in violation of constitutional provisions on its face or as applied."

Liberty interests are implicated when "[s]tate action . . . imposes a stigma that

alters an individual's eligibility to . . . work in a chosen field." *Ryan v. Dep't of*

*Soc. & Health Servs.*, 171 Wn. App. 454, 471-72, 287 P.3d 629 (2012). Before

depriving an individual of life, liberty, or property, they must be afforded due

process of law. *Ryan*, 171 Wn. App. at 471.

Tekle claims DSHS's finding of neglect imposes a permanent stigma that

alters her eligibility to work in her chosen field, and because the Board's decision

was arbitrary and capricious, she was deprived due process of law. While Tekle

is correct her liberty interests were implicated, her argument for why she was not

afforded due process fails because she was given a hearing on the merits as she

requested, and the Board's actions were not arbitrary and capricious. Because

Tekle was afforded due process, we affirm.[5]

Attorney Fees

Tekle contends she is entitled to recover attorney fees under the Equal

Access to Justice Act[6] if she prevails in this appeal. Because we affirm the

---

[5] While we affirm Tekle was afforded due process, we agree with Tekle that the sanctions imposed upon her are harsh and include long term consequences. When an individual is found guilty of neglect of a vulnerable adult, they are put on a permanent registry that prevents them from holding a license to operate an adult family home or having unsupervised access to vulnerable adults. RCW 74.39A.056(2); WAC 388-76-10120(3)–10180(1); WAC 388-113-0030. In addition, an individual found guilty of vulnerable adult neglect in an adult family home cannot petition for removal from the registry. *See Romero v. Dep't of Soc. & Health Servs.,* 30 Wn. App. 2d 323, 544 P.3d 1083 (2024). As Tekle correctly notes in her brief, even the state sex offender registry provides an opportunity for petition for removal. *See* RCW 9A.44.142.

[6] Chapter 4.84.350 RCW.

Board's order, Tekle is not entitled to attorney fees.

We affirm.

_____
Smith, C.J.

WE CONCUR:

_____
Hazel, A.C.J.

_____
Mann, J.